[No. S004397, Crim. No. 22190. Mar. 2, 1989.]

THE PEOPLE, Plaintiff and Respondent, v.
CALVIN COLEMAN, JR., Defendant and Appellant.

122

**COUNSEL**

John McDougall, under appointment by the Supreme Court, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, John H. Sugiyama, Assistant Attorney General, Dane R. Gillette, Derald E. Granberg and Mark S. Howell, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**KAUFMAN, J.**—Defendant Calvin Coleman, Jr., was sentenced to death, after a jury trial under the 1978 death penalty law,[1] for murdering Patricia Neidig on May 13, 1980, under three special circumstances, i.e., that he committed the murder (1) for the purpose of avoiding or preventing lawful arrest (§ 190.2, subd. (a)(5)), (2) in the commission of a robbery (§ 190.2, subd. (a)(17)(i)), and (3) in the commission of a burglary (§ 190.2, subd. (a)(17)(vii)). He also was found to have used a shotgun in committing the murder. (§§ 12022, subd. (a), 12022.5.) This appeal is automatic. (§ 1239, subd. (b).)

Defendant was additionally convicted on seven other counts. Two were crimes against Jean Prendergast: assault with intent to commit murder

---

[1] Penal Code sections 190, 190.1, 190.2, 190.3, 190.4, and 190.5. All further statutory references are to the Penal Code unless otherwise indicated.

(former § 217; count two) and assault with a deadly weapon and by means likely to produce great bodily injury (§ 245, subd. (a); count three). Four were offenses committed against Karen H. (hereafter Karen): rape by force and threats (former § 261, subds. 2, 3; count four), assault with intent to murder (former § 217; count five), assault with a deadly weapon and by means likely to produce great bodily injury (§ 245, subd. (a); count six), and robbery (§ 211; count seven). Count eight was burglary of the Neidig-Prendergast residence (§ 459).

As to counts two, five, and seven, defendant was found to have used deadly weapons (§ 12022, subd. (b)) and to have inflicted great bodily injury (§ 12022.7), and as to count eight (burglary), he was additionally found to have used a shotgun (§§ 12022, subd. (a), 12022.5). He was found to have inflicted great bodily injury in connection with counts three and six (§ 12022.7), and to have used a deadly weapon in connection with count four (§ 12022.3).

The court stayed sentence on counts three, six, and eight and part of the sentence on counts five and seven. The total unstayed prison sentence is 25 years and 4 months.

We shall conclude that the finding of the special circumstance that defendant committed the murder in order to avoid or prevent lawful arrest (§ 190.2, subd. (a)(5)) must be set aside as unsupported by substantial evidence, but that otherwise the judgment convicting defendant of murder and sentencing him to death must be affirmed. We shall further conclude that the convictions on counts two through eight, charging crimes other than murder, must be affirmed, but that the cause must be remanded for resentencing on those counts because of the trial court's failure to explain its decision to impose a full consecutive term on count four, pursuant to section 667.6, subdivision (c), and because of the court's reliance on duplicative factors to justify consecutive terms, upper terms, and enhancements.

## I. GUILT PHASE EVIDENCE

The crimes were committed at the rural home of Patricia Neidig and Jean Prendergast near Windsor in Sonoma County. The two women had moved there in 1973 to retire and to raise pug dogs for show. In addition to the pugs, they had a white German shepherd. Their closest neighbors were the Morse family, who lived across a lake, and, after 1974, the Giannavola family. The Morses operated the Wagon Valley Ranch as a home for boys.

In June 1973, while defendant was one of 16 boys living at the ranch, Ms. Prendergast and Ms. Neidig hired him and other boys to come help build

fences and plant trees. Later in 1973 defendant completed his stay at the ranch, and neither Mrs. Morse nor Ms. Prendergast saw or heard from him again until 1980.

On Sunday, May 11, 1980, at 6:30 p.m., defendant walked into the Healdsburg police station, where people often waited for the bus on weekends when the lobby of the bus depot across the street was closed. Defendant asked the police dispatcher for directions to the Wagon Valley Ranch, where he said he wanted to visit Mrs. Morse on Tuesday. He said he had a job in San Francisco and wanted to tell her how well he had been doing since leaving the ranch. The dispatcher gave him directions to the ranch and explained that the schedule for departures from Windsor to San Francisco was about 15 minutes later than the Healdsburg schedule posted on the wall. Defendant left and returned to the police station intermittently throughout the night even though there were several scheduled bus departures in that period. He told the dispatcher who came on at midnight that he was looking for work in the area.

On Tuesday, May 13, Ms. Neidig and Ms. Prendergast left home at 8:15 a.m. for a day in San Francisco, planning to return at 6 p.m. They had hired Karen, who lived five miles away, to care for the show dogs during their absence.

About 2:15 p.m., defendant rang the doorbell at the nearby Giannavola home. He asked Ms. Giannavola if the ladies with the dogs still lived next door. He said he was interested in working for them but had been deterred by a barking dog when he approached their house. Ms. Giannavola offered to telephone them on his behalf. The call was answered by Karen, who said the ladies were not home and that she had no authority to hire anyone. Ms. Giannavola then told defendant she would pass his name along to Ms. Neidig and Ms. Prendergast, and tell them that if they were interested in hiring defendant, they should call him at the Morse ranch, where he had said he could be reached.

About 3:15 p.m., defendant came to the Morse home and was let into the kitchen. After some conversation, Mrs. Morse recalled him as one who had stayed at the Morse ranch as a 13-year-old boy, 7 years earlier. He said he had been in the Coast Guard and was looking for work. He had been to see some people across the lake, and their housekeeper had told him to return at 5 o'clock. He departed about 4:40 p.m., explaining he was going to see if the people were home yet.

Karen was outdoors at the Neidig-Prendergast residence when she saw defendant walking up the driveway. He said he was looking for work,

explaining how he had worked there in the past. After further conversation, he asked her to check bus departures. She stepped inside the "office," telephoned, and brought him a slip on which she had written two departure times. He next asked for a drink of water, which she brought from the kitchen and handed to him just outside the door.

As she turned away, he grabbed her and ordered her to lie face down on the floor. He picked up a pointed letter opener from a table, ordered her to her feet, put his arm around her waist, aimed the letter opener at her throat, and walked her down the hallway past the bedrooms, saying that there better not be anyone else around, and she better not be lying. He had her show him the master bedroom, which was at the far end of the house. There, he ordered her to lie on the bed. He found a shotgun, which he pointed at her. She got up and tried to grab the gun, but he restrained her and said the gun was not loaded.

He started looking for valuables, saying that he had come from San Francisco to do this and knew who the ladies were, having seen them at the Cow Palace with their dogs. He located one or two paper bags of money, labeled as kennel club dues, and a large quantity of jewelry. He asked her to count the money and to help sort out the jewelry. She told him there was $700 though she was in fact unable to concentrate on counting it. He also selected some clothing, and she helped him pack the gathered items into suitcases and take them to the first bedroom, the one closest to the entry area.

Meanwhile, defendant had picked up a hunting knife with sheath and a shotgun shell from the bedroom bureau. He put the knife in his belt. She said the ladies would return soon, and suggested he tie her up and take her car. He asked her to drive him to San Francisco Airport, but she said her car had only one headlight and they'd be stopped after dark. He said he'd take the ladies' car.

He asked her to go with him and be his lady. Suddenly he turned and kissed her and ordered her to get on the bed and remove her clothes. She complied, and he then undressed, put the knife next to the pillow, and had intercourse with her. He washed himself and ordered her to shower; they then got dressed.

Defendant appeared nervous as they completed packing things into one or two suitcases in the first bedroom. Finally, from the kitchen window they saw the ladies at the far end of the driveway, talking with Mr. Giannavola, who kept his horses on the ladies' property. Defendant, who by then was carrying the shotgun, ordered Karen to lie down in the first bedroom. As

the ladies drove into the carport, defendant told Karen to go into the office (the first room the ladies would enter) and act naturally, while he stood out of sight in the kitchen.

Ms. Neidig entered, carrying a bag of Kentucky fried chicken, and asked Karen about the dogs. Almost immediately, defendant emerged from the kitchen, pointing the shotgun down. At first Ms. Neidig smiled and greeted him, but then he raised the gun and threatened her, whereupon she screamed, "No! no!" and rushed for the door. She managed to get the door part way open before defendant blocked it with his shoulder. She yelled to "Gino" (Mr. Giannavola) to call the police. Defendant pressed the gun up against her face and fired, killing her instantly. Giannavola, when asked if he heard anything "unusual" after the ladies drove up to the home, testified he heard the shot, but did not mention hearing any call or yell.

Defendant then ordered Karen to lie face down on the floor. She felt two blows in her back, then something warm, which she soon realized was blood. After defendant stepped over her, she got up, pushed Ms. Neidig's body out of the way, and rushed out the door, past Giannavola, crying, "A black man just killed Pat. He's going to kill us. Run!" Giannavola took her into his jeep and to his home. She had been stabbed twice and lost considerable blood, but the wounds did not enter the muscle or bone or penetrate the chest cavity.

When Ms. Prendergast heard a scream, she ran into the enclosed kennel-laundry area, from which there was another door into the office. There, she encountered defendant, who beckoned to her. She stood still, and he came up and stabbed her in the right side of the chest. She fell, then got up, went into the office and started to telephone when she saw defendant again. She dropped to the floor, pretending to be dead and waited a long time. Finally, she got up and called the Giannavolas, then a deputy sheriff arrived. Ms. Prendergast had suffered a stab wound which penetrated the liver (without severing any major arteries, veins, or ducts) and caused extensive abdominal bleeding. She required surgery and one year later was still suffering from abdominal pains and digestive problems.

The first call to the sheriff's department came shortly after 6 p.m. After a search of the Neidig-Prendergast home, the deputies noted that Karen's car was parked, with engine idling, across the driveway 100 yards from the house. In a nearby grassy area they found a jacket, through which a sheriff's dog was able to track defendant's scent to an abandoned building at the Wagon Valley Ranch, where defendant was found and arrested.

Defendant testified. His account corroborated most of the prosecution testimony but differed in certain crucial respects. He testified that Karen

invited him into the Neidig-Prendergast house and that he did not intend to steal anything when he first went in. He said he wandered about the house, with Karen following behind, and picked up the letter opener (which he thought was made of gold), the sheathed knife, and the shotgun simply because he thought they were valuable and wanted to take them as well as the money and jewelry he had found. He admitted he told Karen to take off her clothes and had intercourse with her, and conceded she was frightened though he said the knife was on the floor at the time.

He could not say why he loaded the shotgun. He said that while Ms. Neidig was screaming and trying to pull open the door, which he was blocking with his shoulder, Karen came over and grabbed the gun, hitting Ms. Neidig with the barrel, causing the gun to go off. When he saw what the blast had done to Ms. Neidig's face, he "couldn't believe it" and "blanked out." His next recollection, he said, was of running away. He denied intending to shoot Ms. Neidig and denied any recollection of stabbing Karen or Ms. Prendergast.

On rebuttal, a firearms expert testified that the murder weapon's safety device was automatically activated upon loading, and had to be deliberately released before the gun could be fired. He said the gun was "crisp and moderate to heavy in terms of trigger pull." On cross-examination, however, he seemed to concede the safety could be released inadvertently.

A county mental health counselor testified to consultations with Karen. A physician testified that based on his examination of Karen's records, her behavior and symptoms were consistent with rape trauma syndrome.

## II. Penalty Phase Evidence

The prosecution introduced a record of defendant's conviction, on January 25, 1977, of first degree robbery and rape by threats of great bodily harm. The victim of those crimes, Linda D., then testified as follows: In October 1976, she and her five-year-old daughter were moving out of a San Francisco housing project to rejoin her husband in Salinas. She was carrying some belongings from her apartment to her car, to which a small U-Haul was attached and in which her daughter was waiting. Defendant entered the elevator with her, pulled a knife, and ordered her to accompany him to one of the upper floors, where they left her things in a hallway. Taking her up to the roof and into an alcove where there was an old mattress, he ordered her to remove her clothes and raped her, commenting that "white broads" or "white bitches" were "really good." He took her watch, and they returned to her apartment, where he went through her purse and found a welfare check. She offered to sign it over to him, but he

said she would have to cash it. She pleaded to him not to hurt her because her baby was waiting for her in the car. He told her to cash the check at a nearby grocery store and threatened to kill the child if she told anyone what had happened. The store manager refused to cash the check. Defendant then drove her in her car, with the child in the back seat, to a check-cashing place downtown, and let her out to cash the check. He said he would drive around the block and that if she said anything, he'd kill the child. She cashed the check, rejoined defendant in the car, and asked him again to let her go, now that he had the money. He said there were too many "pigs" in that area, and they would have to return to the apartment. At the apartment, defendant was joined by one of his friends, who accompanied defendant, Linda D., and her daughter up the elevator. Defendant again sifted through the belongings in the apartment and finally departed.

The only other prosecution witness at the penalty phase was Dr. Melvin Macomber, who was a correctional psychologist at Deuel Vocational Institution (DVI), where defendant was incarcerated after entering the prison system in February 1977. In March 1978, he interviewed defendant as part of an evaluation of defendant's suitability for release. His impression of defendant was of a "passive-aggressive personality with antisocial personality features." He described defendant's intelligence as "borderline mentally defective," though defendant showed no brain damage. He also said defendant was "criminally oriented," an "immature intellectually and culturally limited individual who responded to things in very defensive and immature and hostile manners."

Macomber noted defendant's numerous disciplinary infractions at DVI, usually involving shouting and verbal threats. The record showed only one instance of physical violence; it involved another inmate, and no aggressor was identified. There was no indication that defendant belonged to a gang. His mother was a heroin addict, and his father had spent a great deal of time in prison. Macomber considered defendant a pitiful young man, the product of parental neglect and irresponsibility.

Macomber recommended in 1978 that defendant be retained in prison, and that if he were released, it be only under strict supervision. He explained that defendant lacked family or community support, had no job skills, and used poor judgment. Defendant was nonetheless released on May 9, 1980. Macomber had reviewed defendant's record up to that time and found nothing to alter his conclusions formed two years earlier.

The defense called a psychologist, Dr. John Podboy, and a psychiatrist, Dr. Robert Aaron. Dr. Podboy concluded from somewhat extensive interviews and tests that defendant suffered from borderline mental retardation

(with I.Q. test scores from 64 to 76) and had difficulties dealing with his environment, whether socially, academically, or occupationally. On cross-examination, Dr. Podboy stated as his impression that defendant was not only dull but also impulsive and criminally oriented, that he could be very dangerous under some circumstances, and that he came from a pathological family background, being the second of eight children, all of whom were removed from the parental home. He also said he essentially agreed with a report in December 1973 by a Dr. Dean that in the context of defendant's mental retardation and disproportionately severe reading handicap, defendant attached positive values to aggressiveness and violence and to dominating other persons to enhance his self-esteem.

Dr. Aaron testified that he had been retained as a psychiatrist to explore the possibility of an insanity or diminished capacity defense at the guilt phase and had concluded that no such defense existed. He had then made an extensive study of defendant's background for the penalty phase, interviewing defendant seven more times, studying records of psychological tests and of the proceedings to remove defendant and his siblings from their mother's custody, and interviewing defendant's sister and half-brother. Dr. Aaron diagnosed defendant as suffering from borderline mental retardation and a severe personality disorder, i.e., antisocial personality, which is characterized emotionally by inability to plan ahead or profit by experience.

Dr. Aaron graphically described defendant's childhood deprivations. Defendant was born in January 1958, when his mother was 17 or 18. He was the second of his mother's eight children, who had four different fathers. His own father, an alcoholic multiple felon, left home when defendant was two. Defendant lived with various friends and relatives in extreme filth and poverty, and suffered multiple beatings, often severe, regularly inflicted upon him by adults. He was a failure in school, where his outbursts led to suspensions and truancy. The mother failed to provide regular food and apparently used the welfare money for drugs or alcohol. At age six or seven, defendant began to shoplift and purse-snatch to obtain food for the family. At ages 11, 12, and 13, he was taking drug pills stolen from his mother and engaging in more burglaries. His father reappeared briefly and helped him learn how to steal. After a while he took pride in skillful burglaries, which became his one successful accomplishment.

At age 13 he became a ward of the juvenile court, from which he underwent multiple placements, "a revolving door situation." There were only two areas of positive experience in his childhood. One was when his great-great grandmother, a cleaning woman and a warm, caring, religious person, periodically took care of him. The other was when some adults at an amusement park, Playland at the Beach, befriended him and gave him a job

and a place to stay. During that time, he stopped the burglarizing and purse snatching, but after four months he was sent back to juvenile hall as a truant.

With the assistance of Raymond Procunier, former director of the California Department of Corrections, Dr. Aaron reviewed defendant's record at DVI. It contained good reports on defendant's work assignments, one of which was in the dairy outside the prison walls. The negative notations, and most of the infractions, were based on yelling and cursing, but none indicated violence against a fellow inmate or a guard. Defendant told Dr. Aaron he avoided joining a gang because he did not want to be asked to hurt or kill someone. Dr. Aaron concluded that defendant could make a good adjustment in prison because his basic needs would be cared for and he would be subject to clear external controls.

Over objections which we discuss later, Dr. Aaron was cross-examined about defendant's statements to him concerning the present crimes. Defendant's account was generally consistent with his testimony except as to the actual shooting. He told Dr. Aaron he was trying to get away, holding the shotgun aimed at the victim's head, and then "I just shot her." He said this in a low, hesitating manner with eyes downcast, but Dr. Aaron was not sure whether defendant was expressing remorse or mere regret.

Lieutenant Larry Hunter, a correctional lieutenant at DVI, described defendant as a better than average inmate who generally got along well with others. He had relatively few problems and avoided involvement with the prison gangs. He was placed in protective custody because of danger from a gang.

Rev. Edward Block, pastor of a Stockton church, testified that upon defendant's release from prison, Rev. Block and a church member brought defendant to Stockton, where defendant hoped to get a job in a dairy. A parole officer, however, told defendant he would have to go to San Francisco. Frank Walker, a San Francisco parole agent, testified that he interviewed defendant on the latter's arrival in San Francisco on Friday, May 9, 1980, and explained the conditions of parole. Defendant said he would stay with his grandmother and eventually wanted to go to his sister's residence in Stockton and get a job with a dairy. He was arrested for the present crimes four days later, on May 13, and held in the Sonoma County Jail. Steven Torringo, a jail correctional officer, testified that defendant got along well with the other inmates and represented his tank on the inmate council.

Lea Kibbe, a private investigator, testified that he located defendant's mother in a San Francisco park. She was drunk, incoherent, and unkempt,

and provided little information. She had seen something about defendant's case on television.

### III. MOTION FOR CHANGE OF VENUE

██ Defendant unsuccessfully moved for a change of venue, and his petition for a writ of mandate to require the granting of the motion was summarily denied by the Court of Appeal. He now claims prejudice from the trial court's refusal to transfer the case to another county for trial.

██ A motion for change of venue must be granted when the defendant shows a reasonable likelihood that a fair trial cannot be had in the original county. (*People* v. *Welch* (1972) 8 Cal.3d 106, 113 [104 Cal.Rptr. 217, 501 P.2d 225].) ██ On appeal from a conviction after denial of the motion, the reviewing court must determine independently whether a fair trial was obtainable. (*People* v. *Harris* (1981) 28 Cal.3d 935, 948 [171 Cal.Rptr. 679, 623 P.2d 240], cert. den. 454 U.S. 882 [70 L.Ed.2d 192, 102 S.Ct. 365].) ██ The controlling factors are the gravity and nature of the crime or crimes, the extent and nature of the pretrial publicity, the size and nature of the community, the status of the victim, the status of the accused, and any indication from the voir dire of prospective and actual jurors that the publicity did in fact have a prejudicial effect. (*People* v. *Balderas* (1985) 41 Cal.3d 144, 177 [222 Cal.Rptr. 184, 711 P.2d 480].)

██ Here, the gravity and nature of the crimes weighed in favor of changing venue because they subjected defendant to the death penalty and had sensational aspects bound to draw public attention. (See *Martinez* v. *Superior Court* (1981) 29 Cal.3d 574, 582 [174 Cal.Rptr. 701, 629 P.2d 502].) These aspects were reflected in the initial extensive reports on television and radio and in the locally circulated newspapers. Besides depicting in detail the circumstances of the crimes and of defendant's arrest, they repeatedly emphasized that defendant was an ex-convict who had been released from prison only four days earlier.

The publicity quickly subsided, however. In the newspaper with the greatest coverage, the Santa Rosa Press-Democrat, there were illustrated front-page stories on May 14, 15, and 16, 1980. On May 22, there was a front-page story headlined, "Murder plea delay for mental testing," and on May 23, a story on an inside page, "Coleman claims he's being victimized by hostile media." The subsequent stories were occasioned by defendant's plea in municipal court (June 10), the preliminary hearing (July 8), the plea in superior court (July 24), a continuance of the trial date (Nov. 10), and the motion for change of venue (Jan. 20, 1981). Thus, the publicity, though

initially graphic, was not "persistent and pervasive" (*Martinez* v. *Superior Court, supra,* 29 Cal.3d 574, 585).

The size of the community is important because in a small rural community, a major crime is likely to be embedded in the public consciousness more deeply and for a longer time than in a populous urban area. (*Martinez* v. *Superior Court, supra,* 29 Cal.3d at p. 581; *People* v. *Harris, supra,* 28 Cal.3d at p. 949.) According to the Bureau of the Census, Sonoma County's population on April 1, 1980, was 299,681. (U.S. Dept. of Commerce, County and City Data Book (1983) p. 60.)[2] The county's three cities having more than 10,000 inhabitants were Santa Rosa (83,320), Petaluma (33,834), and Rohnert Park (22,965). (*Id.* at pp. 820-821; cf. Cal. Dept. Finance, Cal. Statistical Abstract (1984) table B-4, p. 20; *id.* (1980) table B-6, p. 15.) Though not one of the state's major population centers, the county is substantially larger than most of the counties from which this court has ordered venue changes. (See *People* v. *Balderas, supra,* 41 Cal.3d 144, 178-179.) Thus, the county's size does not weigh in favor of a venue change.

Neither defendant nor any of the three victims was publicly prominent before the crimes. Defendant is Black, but the publicity did not particularly dwell on his race. He was from San Francisco, had just been released from prison, and, except for distant recollections of his presence as a juvenile ward in the early '70's, was virtually unknown. The lack of county residents personally acquainted with defendant, however, seems of little weight since the county is of such size that most of its inhabitants would probably not expect to be acquainted with more than a small proportion of their fellow citizens. Predispositions based on a stereotype of defendant or of the victims, rather than on personal acquaintance, might well be present in other counties to which venue could be changed.

█ In support of his pretrial motion for change of venue, defendant called a legally trained psychologist, Craig Haney, who specialized in jury selection in capital cases. He extensively analyzed the publicity surrounding the crimes and the results of a field survey of potential Sonoma County jurors, taken in October-November 1980, and testified that in his opinion there was a substantial likelihood that defendant could not receive a fair trial in the county.

The survey reported interviews with 121 county residents selected randomly from lists of voters and licensed drivers. Dr. Haney testified it was

---

[2] Defendant's opening brief cites a population figure of 284,400, given by the California Statistical Abstract, 1980 edition, table B-6, page 15, as Sonoma County's population on January 1, 1980. The 1984 edition of that publication, however, indicates that on July 1, 1980, the population was 301,500. (Table B-3, p. 15.)

accurate within a 9 percent margin of error, plus or minus. When asked, "Have you heard or read anything about an incident that occurred last spring in which three women were attacked in a farmhouse near Healdsburg, and one of them was killed?" 46 of the 121 (38 percent) answered "yes." The others were then told: "The other two women victims were both stabbed and the youngest one was also raped. Do you remember the case now?" Ten more said "yes." Of the 56 (46.3 percent) who answered affirmatively to one or the other of those inquiries, 13 thought defendant "definitely guilty," and 25 thought him "probably guilty." Of the 38 who thought defendant definitely or probably guilty (31.4 percent of the sample), 19 (15.7 percent) thought he should receive the death penalty. When asked for narrative accounts of their recollections of the incident and of their feelings about it, most of those who recalled the case mentioned defendant's prior imprisonment, and practically all expressed shock and outrage.

This forecast of the effect of pretrial publicity on the fairness of defendant's trial must now be considered in conjunction with the actual selection of the jury. ■■ Though the fact that all the jurors selected said they could be impartial does not automatically establish the possibility of a fair trial (*People* v. *Tidwell* (1970) 3 Cal.3d 62, 73 [89 Cal.Rptr. 44, 473 P.2d 748]; *People* v. *McKay* (1951) 37 Cal.2d 792, 798 [236 P.2d 145]), "voir dire may demonstrate that pretrial publicity had no prejudicial effect" (*People* v. *Harris, supra,* 28 Cal.3d 935, 949).

■■ Twelve jurors and four alternates were selected from forty-one persons examined on voir dire. Each side was entitled to 26 peremptory challenges (former § 1070, subd. (a)), but the prosecution exercised only 10 such challenges and the defense, 11. Of the 41 persons examined, only 15 disclosed any knowledge or recognition of the case. Of these fifteen, only three were excused for cause, and only one of the three (Tunzi) for prejudice stemming solely from media publicity. Another of them (Taylor) was prejudiced because one of the victims was the niece of her next door neighbor, and the other (Lewis), because he lived near the crime scene and had repeatedly discussed the case with local residents.

The prosecution peremptorily challenged three persons who recalled learning about the case from newspapers or TV, and one more who simply recognized defendant's surname. The defense exercised two peremptory challenges against persons who had read about the case and one (Dunn) who had learned about it not from the media but from discussions with a friend who had acquired knowledge of the case as a reserve deputy sheriff.

Of the jurors actually chosen, one (Davis) said that defendant's given name and the surname of a victim sounded familiar, and another (Sparks)

had read just enough about the case to make sure a victim was not the juror's friend of the same name. Another juror (Waters) had not learned about the case when the crimes occurred but had seen a recent newspaper article about the upcoming trial. Still another juror (Dufford) had read about the case in the newspaper but said he could set that aside "because it's only a newspaper and they tend to report the spectacular." Finally, one of the jurors (Cavalini) volunteered to the court that after her voir dire was completed, her husband told her he heard that defendant had been released from prison and that the crimes occurred when defendant went to see his former employer. She replied that she did not want to hear any more about it.

■■ This record of the voir dire shows that the pretrial publicity was not a barrier to defendant's receiving a fair trial. The publicity did not pervade the proceedings so as to give rise to any inference or presumption of prejudice. (See *Murphy* v. *Florida* (1975) 421 U.S. 794 [44 L.Ed.2d 589, 95 S.Ct. 2031].) It is also significant that defendant used less than half of his peremptory challenges. (Compare *People* v. *Sommerhalder* (1973) 9 Cal.3d 290, 303 [107 Cal.Rptr. 289, 508 P.2d 289] [peremptory challenges left unexercised] with *People* v. *Tidwell, supra,* 3 Cal.3d 62, 67 [peremptory challenges exhausted], and *People* v. *McKay, supra,* 37 Cal.2d 792, 798 [same].)

Accordingly, the denial of defendant's motion for change of venue was not prejudicial error.

## IV. DENIAL OF REPRESENTATIVE JURY

■ A prospective juror, Mrs. Blaisdell, was excused for cause because of her professed opposition to the death penalty. Defendant contends he was thereby deprived of his right to a jury drawn from a representative cross-section of the community. The contention must be rejected. (*People* v. *Ghent* (1987) 43 Cal.3d 739, 753-754 [239 Cal.Rptr. 82, 739 P.2d 1250]; see *Lockhart* v. *McCree* (1986) 476 U.S. 162 [90 L.Ed.2d 137, 106 S.Ct. 1758].)

## V. PROPRIETY OF EXCLUDING JUROR FOR OPPOSITION TO DEATH PENALTY

■ Defendant contends that the exclusion for cause of prospective juror Blaisdell was prejudicially erroneous because her opposition to the death penalty was not made sufficiently clear. Under the applicable standard, such exclusion may be based on the "juror's views [which] would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath,'" and it is not necessary that the "juror's

bias be proved with 'unmistakable clarity.'" (*Wainwright* v. *Witt* (1985) 469 U.S. 412, 424 [83 L.Ed.2d 841, 852, 105 S.Ct. 844] [quoting from *Adams* v. *Texas* (1980) 448 U.S. 38, 45 (65 L.Ed.2d 581, 589, 100 S.Ct. 2521)]; accord: *People* v. *Ghent, supra,* 43 Cal.3d 739, 767.)

The trial judge asked Mrs. Blaisdell whether, because of conscientious opposition to the death penalty, she would automatically vote for something other than first degree murder at the guilt phase in order to end the death penalty question once and for all. She first answered, "I'm afraid I would vote against the death penalty." The judge then reworded the question twice. Her answers were, respectively, "I'm afraid I would" and "Yes. I am, in my mind, would vote against murder in the first degree."

In answer to defense counsel's questions, Mrs. Blaisdell stated that as to guilt, she "would have to vote however I felt about the witnesses and the proof shown." But when the judge then rephrased his earlier question, whether she would vote against guilt of first degree murder regardless of the evidence in order to avoid the death penalty question, she replied: "I'm afraid I would avoid the death penalty. I would vote so that I wouldn't have the death penalty on my mind." She continued to repeat this affirmative response in various forms. Finally, defense counsel asked whether at the penalty phase, she "could set aside your own personal feelings and apply the law and consider the death penalty." She replied: " . . . If I voted for the death penalty, I would be voting for that, for death, and this would be something I—I just wouldn't want to vote anyone—regardless, I guess, of the evidence, I just wouldn't want to—'Thou shalt not kill,' one of the Ten Commandments, comes to mind . . . ."

Although this voir dire arguably left open a possibility that Mrs. Blaisdell could set aside her feelings against the death penalty in determining *guilt,* it made clear that in any event she could not vote to impose the death penalty. She was properly disqualified because her views would have prevented or substantially impaired the performance of her duties as a juror. (*Wainwright* v. *Witt, supra,* 469 U.S. 412, 424 [83 L.Ed.2d 841, 851-852]; *People* v. *Ghent, supra,* 43 Cal.3d 739, 767.)

## VI. Jury Instructions' Omission of Intent to "Kill" as Requirement for Assault With Intent to Murder

 Defendant contends that in instructing the jury on the two charges of assault with intent to commit murder (former § 217), allegedly perpetrated against Jean Prendergast and Karen, the trial court prejudicially erred by omitting the requirement of an intent to kill. The repeal of section 217 as of January 1, 1981 (shortly after the present crimes occurred), abolished the

crime of assault with intent to commit murder, leaving acts formerly prosecuted under the repealed section punishable as attempted murder under section 664. ■■■ It is well settled that both the former crime of assault with intent to commit murder (of which defendant was convicted) and the crime of attempted murder require a specific intent to kill and cannot be based on mere implied malice even though implied malice would sustain a charge of murder itself. (*People* v. *Lee* (1987) 43 Cal.3d 666, 670 [238 Cal.Rptr. 406, 738 P.2d 752]; *People* v. *Ramos* (1982) 30 Cal.3d 553, 583-584 [180 Cal.Rptr. 266, 639 P.2d 908]; *People* v. *Murtishaw* (1981) 29 Cal.3d 733, 762-765 [175 Cal.Rptr. 738, 631 P.2d 446].)

In *Lee* the jury instructions were inconsistent. The trial court correctly instructed that the crime of attempted murder requires a specific intent to kill a human being (CALJIC No. 3.31) but also instructed that the crime is an unlawful attempted killing with malice aforethought. It further instructed that malice may be implied when the attempted killing results from an intentional act involving a high degree of probability that it will result in death, and that under that circumstance, it is not necessary to establish that the defendant intended to kill. (CALJIC Nos. 8.11, 8.31.) We held it was error to give the instructions basing the crime of attempted murder on implied malice. (43 Cal.3d at p. 671.)

■■■ In the present jury instructions, the initial references to intent dealt with the sufficiency of circumstantial evidence to prove specific intent in the crimes of murder, assault with intent to commit murder, robbery, and burglary. (CALJIC No. 2.02.) Somewhat later, the jury was instructed that as to each of those crimes, "there must exist a union or joint operation of act or conduct and a certain specific intent in the mind of the perpetrator . . . . The specific intent required is included in the definitions of the crimes charged." (CALJIC No. 3.31.)

Very soon thereafter, the court announced that "the next series of instructions deal with the charge of murder . . . generally, with murder in the first degree, murder in the second degree, and then a lesser included offense of murder, which is involuntary manslaughter." The ensuing murder instructions included the following statements pertaining to state of mind: "The crime of murder is the unlawful killing of a human being with malice aforethought. . . ." (CALJIC No. 8.10.) "Malice may be either express or implied. Malice is express when there is manifested an intent unlawfully to kill a human being. Malice is implied when the killing results from an act involving a high degree of probability that it will result in death, which act is done for a base, antisocial purpose and with a wanton disregard for human life . . . or when the killing is a direct causal result of the perpetration or the attempt to perpetrate a felony inherently dangerous to human

life. Burglary, robbery and rape are such a felony." (Former CALJIC No. 8.11, last sentence added by the court.) Although second degree murder may involve an intent to kill (CALJIC No. 8.30), it "is also the unlawful killing of a human being as the direct causal result of an act involving a high degree of probability that it will result in death, which act is done for a base, antisocial purpose and with wanton disregard for human life . . . . When the killing is the direct result of such an act, it is not necessary to establish that the defendant intended that his act would result in the death of a human being." (CALJIC No. 8.31.)

Having completed the instructions on murder, manslaughter, and special circumstances, the court announced that the next series of instructions would deal with (1) assault with a deadly weapon or by means of force likely to produce great bodily injury and (2) assault with intent to commit murder. The court carefully explained that the former requires only a general intent, whereas the latter requires a specific intent, on which the jury was instructed as follows: "Every person who assaults another with the specific intent to commit murder is guilty of the crime of assault to commit murder. [¶] In order to prove the commission of the crime of assault to commit murder, each of the following elements must be proved: [¶] 1. That a person was assaulted, and [¶] 2. That the assault was made with the specific intent to commit murder." (CALJIC No. 9.01.)

Defendant contends that because of the instructions (1) that the mental state requisite to the crime of assault with intent to commit murder was an "intent to commit murder" and (2) that murder could be committed either with express malice, which requires an intent to kill a human being, or with implied malice, which requires a mental state short of such intent, the instructions stated or implied to the jury that the crime of assault with intent to commit murder did not require an intent to kill. In our view, the instructions could not have been so understood. The jury was repeatedly told that the crime of assault with intent to commit murder requires a "specific intent to commit murder." Murder by any commonsense definition is a form of killing; moreover, the jury had been instructed that "murder is the unlawful killing of a human being with malice aforethought" (CALJIC No. 8.10). Thus, it is impossible to intend to commit a murder without intending to kill.

Indeed, the word "kill" no more implies intentionality than does the word "murder." It is the combination of "intent to" with either "murder" or "kill" that conveys an intent to effect the death of another. The proper instruction that one can be guilty of *murder* on the basis of implied malice not involving an intent to kill, did not state or imply that one could be

guilty of a crime which requires a specific *intent* to *commit* murder without intending to kill.

Nothing in counsel's final arguments at the guilt phase misled the jury to the contrary. The prosecutor introduced the issue of intent on counts II and V (assault with intent to commit murder) this way: "[T]here has to be the specific mental state, the specific intent to murder. We have already talked about murder, the unlawful killing of a human being with malice afore-thought. Was this in the defendant's mind when he assaulted Mrs. Prender-gast? Was it in his mind to commit murder? Was it in his mind to commit murder on [Karen] when he assaulted her? That is your decision on those two charges." He went on to argue that such intent could be inferred from defendant's infliction on both victims of deep stab wounds in vital areas of their bodies and from the fact they both were potential witnesses to his shooting of Ms. Neidig.

Defendant's counsel argued that the two charges of assault with intent to commit murder "require a specific intent, that when you assault them you specifically intended to kill them." He urged the jury to conclude there was no such intent in light of defendant's testimony of the gun's going off accidentally, his horror at seeing Ms. Neidig's face, and his loss of memory of events from then until after he started to run away.

Defendant relies on *People* v. *Murtishaw, supra,* 29 Cal.3d 733. There, as here, the defendant was charged with murder and with an assault with intent to commit murder (former § 217) on a surviving victim. The jury was told that (1) murder could be based on any of three theories: express malice requiring an intention to kill; implied malice arising out of certain kinds of dangerous, wanton acts; or implied malice consisting of felony murder; and (2) section 217 would be violated by an assault "with the specific intent to commit murder." The *Murtishaw* court concluded that these instructions "defined [intent to murder] to include forms of murder not requiring an intent to kill" (29 Cal.3d at p. 763) and were therefore erroneous, since "[i]mplied malice, as defined in [the instructions given], cannot coexist with a specific intent to kill. To instruct on implied malice in that setting, there-fore, may confuse the jury by suggesting that they can convict without finding a specific intent to kill" (*id.* at p. 765). We agree that implied malice is inconsistent with an intent to kill, but it does not follow that where a defendant is charged with both murder and assault with intent to commit murder, a reasonable jury will think that a "specific intent to commit mur-der," specified as an element of the *latter* crime, does not require an intent to *kill,* simply because they have been instructed that *murder itself* can be committed with implied malice.

*Murtishaw,* which like the present case involved assault with intent to commit murder (former § 217), was cited in later cases involving attempted murder. Thus, in *People* v. *Ramos, supra,* 30 Cal.3d 553, the jury was instructed that an attempt consists of a specific intent to commit the crime and a direct but ineffectual act towards its commission. Since the defendant was also charged with murder, the court also gave instructions on express malice, implied malice, and felony murder. The *Ramos* court held that the "instructions thus implied that the jury should find appellant guilty of attempted murder if it determined that appellant intentionally committed an act which, were the victim to die, would constitute murder on an implied malice or felony-murder theory." (*Id.* at p. 583.) In *People* v. *Croy* (1985) 41 Cal.3d 1 [221 Cal.Rptr. 592, 710 P.2d 392], this *Ramos* holding was followed and quoted even though the jury had been told that attempted murder " 'consists of two elements, namely, *a specific intent to commit the crime of Murder* and a direct but ineffectual act done toward its commission' " (*id.* at p. 20, italics added).

In *People* v. *Montiel* (1985) 39 Cal.3d 910 [218 Cal.Rptr. 572, 705 P.2d 1248], this court held that compliance with the former rule that a felony-murder special circumstance necessarily requires proof of the actual killer's intent to kill (*Carlos* v. *Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862], overruled by *People* v. *Anderson* (1987) 43 Cal.3d 1104, 1138-1147 [240 Cal.Rptr. 585, 742 P.2d 1306]) was excused by the fact that the intent issue "was necessarily resolved adversely to the defendant under other, properly given instructions" (*People* v. *Sedeno* (1974) 10 Cal.3d 703, 721 [112 Cal.Rptr. 1, 518 P.2d 913], quoted in *People* v. *Garcia* (1984) 36 Cal.3d 539, 555 [205 Cal.Rptr. 265, 684 P.2d 826]), in that the jury had found, as a special circumstance, that "the murder was intentional and carried out for financial gain" (§ 190.2, subd. (a)(1)). Citing *Murtishaw,* the defendant contended that "the finding that 'the *murder* was intentional' was insufficient; the jury still was not required to find an intent to *kill*." (39 Cal.3d at p. 926.) The contention was rejected: "Unlike the situation in *Murtishaw,* requiring the jury here to find that the murder was intentional directed it to determine whether the defendant intentionally sought the victim's *death*; no other possible distinction can be drawn between intentional and unintentional murders in this context." (*Id.* at p. 927.) A footnote added: "The analogous situation in *Murtishaw* would have arisen had the jury been instructed to find an intent to commit *intentional* murder, rather than an intent to commit murder." (*Id.* at p. 927, fn. 5.)

By that analysis, the mischief denounced by *Murtishaw* arose because the jury might have understood the instructions to encompass an *intent* to commit an *unintentional* murder. We find it inconceivable on this record that even the possibility of such an absurd, self-contradictory interpretation

would have occurred to any reasonable juror. A murder based on implied malice involves an unintentional killing resulting from an illegal act of a nature sufficient to establish the implied malice. It is not logically possible to specifically intend to commit an unintentional murder.

■ We adhere to the rule that the crimes of assault with intent to commit murder (former § 217) and of attempted murder require a specific intent to kill a human being—an intent which can never be replaced by implied malice. (*People* v. *Lee, supra,* 43 Cal.3d 666, 670-671.) Moreover, in view of the controversy surrounding instructions on an intent to "murder" in this context, the required intent should be described to the jury as an intent to "kill" another. (See, e.g., CALJIC No. 8.66 (1987).) ■ Nonetheless, we do not believe the jury in the present case could have understood the instructional references to "a specific intent to commit murder" as meaning any state of mind less than an intent to kill, notwithstanding the instructions on implied malice given in connection with the murder charge.

## VII. EVIDENTIARY RULINGS ON CLAIM OF APPARENT CONSENT AS DEFENSE TO RAPE CHARGE

The jury was instructed that a defendant's reasonable and good faith belief that a person voluntarily consented to sexual intercourse is a defense to a charge of forcibly raping her, and that if the jury had a reasonable doubt whether defendant had such a belief, they should acquit him of that charge. (CALJIC No. 10.23, based on *People* v. *Mayberry* (1975) 15 Cal.3d 143, 153-157 [125 Cal.Rptr. 745, 542 P.2d 1337].) Defendant attempted to prove such a defense through his testimony that Karen invited him into the house, volunteered that the ladies who lived there were pretty rich, started counting the money without being asked to do so, and said nothing when he told her to take off her clothes. He testified he did not use profane language or hit or choke her, but when asked whether she was frightened, replied that "under the circumstances, I would say yes." Defendant also had the jury listen to a tape recording of an interview between Karen and a detective the day after the crimes occurred, to demonstrate composure in her speech and to impeach certain details of her testimony.

In rebuttal on this issue, the prosecution called two witnesses, a counselor from a county mental health clinic, and a physician who specialized in the examination and treatment of sexual assault victims. Defendant claims prejudicial errors in the admission of their testimony.

The counselor, Shirley Barnhart, testified that in February 1981, Karen consulted her with respect to feelings and psychological problems stemming from involvement in a murder, rape, and robbery. Defendant made a hear-

say objection to any testimony by the counselor of Karen's statements. The prosecutor said the testimony was being offered in rebuttal on the issue of Karen's state of mind, whereupon the trial court ruled the testimony admissible except for statements about events on the day of the crimes. The counselor then recounted statements by Karen that she had had little feeling about the crimes immediately after they occurred, but that a few months later, she began experiencing nervousness and various great fears, which she described in detail.

■ Defendant contends that although Karen's statements to the counselor were indicative of her state of mind at the time the statements were made, they were not relevant to the issue whether at the time of the alleged rape, defendant reasonably and in good faith believed she was consenting to intercourse. The Attorney General argues that this contention of irrelevancy was waived because the only objection to the evidence was on the ground of hearsay. In response, defendant cites *People* v. *Vindiola* (1979) 96 Cal.App.3d 370, 378 [158 Cal.Rptr. 6], where the Court of Appeal, after declaring that certain evidence was "irrelevant to any issue before the court" and therefore "not admissible on any ground," continued: "Since it was not admissible on any ground, the *hearsay* objection to its admissibility was sufficient to preserve the issue on appeal. (*People* v. *Terry* (1962) 57 Cal.2d 538, 567-568 [21 Cal.Rptr. 185, 370 P.2d 985]; *Swan* v. *Thompson* (1899) 124 Cal. 193, 195 [56 P. 878].)" (Italics added.) The two cited decisions, however, hold only that a *general* objection is sufficient to preserve for appeal a contention that the evidence was inadmissible for any purpose.

Whether or not the relevancy objection to the counselor's testimony was waived, it is without merit. Statements of a complaining witness to a counselor describing emotional and psychological trauma suffered by the witness following an alleged rape are admissible as circumstantial evidence on the question whether the defendant had a reasonable good faith belief that the witness had consented to his act. (*People* v. *Bledsoe* (1984) 36 Cal.3d 236, 246, 250, fn. 12, 251 [203 Cal.Rptr. 450, 681 P.2d 291].) Here, the counselor's testimony was proper to rebut arguable inferences from the taped interview or from defendant's testimony that Karen's words or conduct could reasonably have been understood as manifesting consent to his sexual act. (*Id.* at p. 248.)

■ A more serious problem is presented by the testimony of the physician, Dr. Novotny, to which an objection of irrelevancy was overruled. He did not examine Karen personally, but reviewed her medical records, her taped interview with the detective, and her statements to the counselor, Ms. Barnhart, and testified that in his professional opinion, her conduct and

statements were consistent with "rape trauma syndrome." He did not, however, state expressly that she had been raped or assaulted.

In *People* v. *Bledsoe, supra,* 36 Cal.3d 236, we held that "expert testimony that a complaining witness suffers from rape trauma syndrome is not admissible to prove that the witness was raped." (*Id.* at p. 251.) "Even when the expert stops short of expressing an opinion on the ultimate issue of whether the complaining witness was raped and, as here, states simply that the witness is suffering from 'rape trauma syndrome,' the use of this terminology is likely to mislead the jury into inferring that such a classification reflects a scientific judgment that the witness was, in fact, raped." (*Id.* at p. 251, fn. 14.) We recognized the propriety of introducing evidence on rape trauma syndrome under some circumstances to "provid[e] the jury with recent findings of professional research on the subject of a victim's reaction to sexual assault" (*id.* at p. 247), but such evidence "is limited to discussion of victims as a class, supported by references to literature and experience (such as an expert normally relies upon) and does not extend to discussion and diagnosis of the witness in the case at hand" (*People* v. *Roscoe* (1985) 168 Cal.App.3d 1093, 1100 [215 Cal.Rptr. 45]). Here, though Dr. Novotny had not examined Karen in person, he testified in detail to the records of her conduct and responses and stated his opinion that they were consistent with rape trauma syndrome. Hence, admissibility of his testimony over the objection of irrelevancy was error under *Bledsoe*.

The question remains whether the error was prejudicial. In *Bledsoe, supra,* 36 Cal.3d at page 252, we concluded there was no prejudice because the case against the defendant was so strong that it was not reasonably probable that the erroneously admitted expert testimony affected the result (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]). The same is true here. Defendant admitted that he was a stranger to Karen, and that prior to the sexual encounter he had picked up the letter opener, put the knife in his belt, pointed the shotgun at her (telling her not to panic because it was not loaded), and "told" her to undress. He also conceded she was frightened when he had intercourse with her. Karen herself testified that defendant forced his way into the house and told her he "was the boss" and was going to rape her, and that she not only was frightened but was crying. Even in the absence of Dr. Novotny's erroneously admitted testimony that Karen's conduct was consistent with rape trauma syndrome, it is not reasonably probable that the jury would have concluded that defendant had a reasonable, good faith belief that Karen was consenting to his sexual act, or even that the jury would have entertained a reasonable doubt whether defendant had such a belief. Accordingly, the error was nonprejudicial. (*People* v. *Watson, supra,* 46 Cal.2d 818, 836.)

## VIII. Sufficiency of Evidence for Special Circumstance of Murder to Avoid Arrest

■■ Defendant claims there is not sufficient evidence to support the jury's finding of the special circumstance that he killed Ms. Neidig for the purpose of avoiding or preventing a lawful arrest (§ 190.2, subd. (a)(5)). In *People* v. *Bigelow* (1984) 37 Cal.3d 731 [209 Cal.Rptr. 328, 691 P.2d 994, 64 A.L.R.4th 723], defendant and his companion, who had recently escaped from prison and were on a crime spree, decided to hitchhike so as to steal the driver's car and money. They forced the driver who picked them up to drive a mile through farmland and get out of the car and into a cornfield, where they shot him. (*Id.* at pp. 738-739.) This court held: "We find no evidence in the record that Cherry was murdered to avoid or prevent a lawful arrest. At the time of the killing Bigelow and Ramandonovic were not under arrest and were not threatened with imminent arrest. Although the prosecutor surmised that Cherry was killed so that he would not report the robbery and kidnapping—a report which might eventually lead to the men's arrest—this argument is totally speculative. It is also an unreasonably expansive reading of the special circumstance of avoiding arrest, a reading which would cause that circumstance to overlap extensively with felony murder. We believe the special circumstance of avoiding arrest should be limited to cases in which the arrest is imminent." (*Id.* at p. 752.)

In a footnote to the quoted passage, the *Bigelow* opinion pointed out that the practical effect of allowing the special circumstance to be found in that case would be to undermine the exception to the special circumstance of intentionally killing a witness to prevent his testimony, which applies only if "the killing was not committed during the commission, or attempted commission of the crime to which he was a witness" (§ 190.2, subd. (a)(10)). "[A]ll the prosecutor would have to do is to claim that the victim was killed . . . to prevent him from reporting the crime to the police, and the result would be to extend the avoiding arrest circumstance to virtually all felony murders." (37 Cal.3d at p. 752, fn. 13.)

Here, defendant had seen Ms. Neidig talking with her neighbor, Mr. Giannavola, at the far end of her driveway just before she entered her house. After she entered, he raised the shotgun, threatening her. She screamed and tried to escape, but defendant blocked the door with his shoulder. Through the partially opened door, she yelled to the neighbor to call the police but there was no evidence he could or did hear her. Defendant immediately killed her with a single blast of the gun.

The Attorney General urges the present case is distinguishable from *Bigelow, supra,* 37 Cal.3d 731, because it is clear that Ms. Neidig was

seeking to report the crime and had set the wheels in motion by yelling to her neighbor. However, there was no evidence that any imminent arrest was possible under the circumstances. It is suggested that Mr. Giannavola might have made a citizen's arrest, but there is no evidence of facts apparent to defendant that Giannavola had the intention or capability of doing so.

We conclude the finding of the special circumstance of a killing to avoid lawful arrest (§ 190.2, subd. (a)(5)) must be set aside as contrary to the holding in *Bigelow*.

## IX. ROBBERY AND BURGLARY SPECIAL CIRCUMSTANCES: CLAIMS OF OVERLAP AND OF REQUIREMENT OF INTENT TO KILL

■ Defendant contends it was error to charge and instruct the jury on both the robbery special circumstance (§ 190.2, subd. (a)(17)(i)) and the burglary special circumstance (§ 190.2, subd. (a)(17)(vii)), since both depended on the same larcenous intent. He relies on the plurality opinion in *People* v. *Harris* (1984) 36 Cal.3d 36, 60-67 [201 Cal.Rptr. 782, 679 P.2d 433]. We have since held, however, that both of these special circumstances can be charged and considered in aggravation of the penalty since each invades a separate societal interest; a robbery invades personal integrity and a burglary invades the sanctity of the home. (*People* v. *Melton* (1988) 44 Cal.3d 713, 765-769 [244 Cal.Rptr. 867, 750 P.2d 741].) Thus, it was proper to authorize the jury to find both the robbery and the burglary special circumstances.

■ Defendant's briefs, relying on Carlos v. *Superior Court, supra,* 35 Cal.3d 131, contend it was error to omit instructions to the jury not to find a special circumstance of killing in the commission of burglary or a robbery unless they were satisfied that defendant intended to kill Ms. Neidig. In *People* v. *Anderson, supra,* 43 Cal.3d 1104, 1138-1147, we overruled *Carlos* and held that where, as here, the defendant is the actual killer, intent to kill is not an element of a felony-murder special circumstance. The instructions given were properly consistent with that holding.

## X. EFFECT OF ERRONEOUS SPECIAL-CIRCUMSTANCE FINDING

■ As heretofore explained, the finding of the special circumstance that defendant killed Ms. Neidig to avoid or prevent lawful arrest (§ 190.2, subd. (a)(5)) is unsupported by substantial evidence and must be set aside in light of *People* v. *Bigelow, supra,* 37 Cal.3d 738, 752. On the other hand, there was no error in the findings of the special circumstances that the killing was perpetrated in the commission of a robbery (§ 190.2, subd. (a)(17)(i)) and a burglary (§ 190.2, subd. (a)(17)(vii)). The jury was properly

instructed at the penalty phase to consider "the existence of any special circumstances found to be true" (§ 190.3, factor (a)). Defendant contends that this instruction prejudiced him by authorizing the jury to take into account the erroneously found special circumstance.

In *People* v. *Allen* (1986) 42 Cal.3d 1222 [232 Cal.Rptr. 849, 729 P.2d 115], the jury was allowed to consider, as aggravating factors, 11 special circumstances of which only 3 had been properly found. Moreover, the prosecutor's closing argument contained repeated references to 11, rather than 3, special circumstances. His major emphasis, however, was on other aggravating factors, i.e., present and former convictions and uncharged crimes, all supported by overwhelming evidence. Under those circumstances, a majority of the court concluded there had been no prejudicial error at the penalty phase. (*Id.* at pp. 1281-1283 (plur. opn.), p. 1288 (conc. opn. of Panelli, J.).)

Here, the prosecutor opened his penalty phase argument by referring to the fact that the jury had already found that defendant committed first degree murder "under special circumstances, to prevent an arrest and during the course of a burglary and a robbery," and went on to itemize the statutory aggravating and mitigating factors, including "the existence of special circumstances that were found true." The balance of the argument, however, contained only one other reference, indirect in nature, to the improperly found special circumstance: "[L]ook what happened on May 13th after the killing of Mrs. Neidig; the two possible witnesses were both assaulted and nearly killed, and the only reason that I feel for that conduct was to prevent not only an arrest but also to prevent anyone from testifying against him later if he happened to be caught. And the only reason he was caught is because Mr. Giannavola was out there." The argument generally reviewed the evidence and contended that defendant's present and past crimes were committed with cold deliberation and should not be excused by any psychological disorder or childhood deprivation. The jury instruction to consider the special circumstances found true at the guilt phase "did not permit consideration of any evidence that was not otherwise admissible and relevant to the penalty decision" (*Allen, supra,* 42 Cal.3d at p. 1281). Accordingly, defendant was not prejudiced by the erroneous finding of a special circumstance of killing to avoid or prevent arrest since there is no reasonable possibility that elimination of that finding would have affected the verdict.

## XI. EVIDENCE OF CHILD-KIDNAPPING IN CONNECTION WITH PRIOR RAPE AND ROBBERY

█ As already explained, the prosecution introduced at the penalty phase a record of a defendant's conviction, in January 1977, of robbery and

of rape by threats of great bodily harm, and presented testimony by Linda D., the victim of those crimes. Prior to her testimony, defendant moved to exclude from it, as unduly prejudicial, any reference to defendant's conduct toward her five-year-old daughter. The motion was denied.

In her testimony, Linda D. stated that defendant drove her in her car, with the child in the back seat, to a check-cashing place where he let her out to cash her welfare check, threatening that if she said anything, he would kill the child. Defendant contends that this part of the testimony should have been excluded because it was not relevant to the crimes of rape and robbery for which defendant had been convicted, but pertained only to an unadjudicated offense of kidnapping (§ 207 et seq.). We disagree. The testimony was probative of criminal activity to be considered in aggravation of the penalty because it involved "the express or implied threat to use force or violence" (§ 190.3, factor (b)). Evidence of an unadjudicated crime is admissible to prove this aggravating factor whether the crime was never charged (*People* v. *Balderas, supra,* 41 Cal.3d 144, 205) or was included in a charge that was dismissed without determination of its merits (*People* v. *Ghent, supra,* 43 Cal.3d 739, 774).

 Defendant contends that the jury instruction requiring that prior criminal activity be proved beyond a reasonable doubt (see *People* v. *Ghent, supra,* 43 Cal.3d 739, 773; *People* v. *Robertson* (1982) 33 Cal.3d 21, 53-55 [188 Cal.Rptr. 77, 655 P.2d 279]) improperly focused on the conviction of rape and robbery and the rape itself in such a way as to mislead the jury into not applying the reasonable doubt requirement to the unadjudicated kidnapping. After properly instructing on the burden of proof, the court added: "And here [is] what the court is talking about. The burden of proving alleged criminal activity and the prior felony conviction beyond a reasonable doubt is in regards to the testimony of the woman in regards to the alleged rape that she testified to and the document that was received by you. The court is instructing you that as to that conduct you must find, if you are to consider that, that he was responsible for that—I mean that he committed that, and that burden is beyond a reasonable doubt and to a moral certainty."

We see no reasonable possibility that the jury was misled. The only evidence of prior criminal activity introduced at the penalty phase was the record of defendant's conviction of raping and robbing Linda D. and her testimony of the events underlying that conviction. The jury may well have understood the court's reference to "the testimony of the woman in regards to the alleged rape" to include her testimony of the entire incident involving rape, robbery, and kidnapping. The court did not state that the principle applied only to the rape as such. To the contrary, immediately after the

above-quoted passage, the instructions continued: "So, let me say that again. A defendant is presumed to be innocent of criminal activity and of any prior felony conviction until the contrary is proved, and in the case of a reasonable doubt whether such prior criminal activity or prior felony conviction is satisfactorily shown, you are instructed not to consider such alleged criminal activity or alleged felony conviction." This strong reiteration of the general rule eliminated any possibility of the misleading effect which defendant now claims to find in the court's preceding comments.

## XII. PREDICTION BY PROSECUTION PSYCHOLOGIST OF DEFENDANT'S FUTURE DANGEROUSNESS

As explained earlier, one of the two witnesses called by the prosecution in its case in chief at the penalty phase was a prison psychologist, Dr. Macomber, who had evaluated defendant's suitability for release from DVI. Macomber testified that defendant had a passive-aggressive, antisocial personality and was criminally oriented, immature, and defensive. He recommended that defendant be retained in prison, and if not retained, released only under strict supervision.

This testimony might have been subject to exclusion, upon proper objection, under two holdings of this court which were rendered after the trial. One of these is the holding in *People* v. *Murtishaw, supra,* 29 Cal.3d 733, 767-775, that penalty phase testimony by a prosecution expert predicting that the defendant will commit future acts of violence must be excluded as unreliable. The other is the holding in *People* v. *Boyd* (1985) 38 Cal.3d 762, 772-776 [215 Cal.Rptr. 1, 700 P.2d 782], that evidence of the defendant's character and background, not relevant to any of the aggravating or mitigating factors listed in section 190.3 other than factor (k), must not be introduced by the prosecution as part of its case in chief at the penalty phase.

Defendant did not object to Macomber's testimony but contends that he did not thereby waive claims of error based on unforeseen changes in the law. The Attorney General replies that inasmuch as the relevant holdings were unforeseen, they should not be retroactive. We need not resolve these questions (see *People* v. *Montiel, supra,* 39 Cal.3d 910, 929) since even if error be assumed, defendant was not prejudiced.

In *Murtishaw,* the erroneously admitted testimony, which was the prosecution's principal penalty phase evidence, predicted that Murtishaw would be violent and homicidal *in prison.* (29 Cal.3d at pp. 767, 775.) Macomber's prediction, in contrast, was that defendant would engage in criminal conduct if *released* from prison. On cross-examination, Macomber was asked

how he reconciled his prediction with the absence of violent acts by defendant in prison; the answer was that since there are guards in prison, defendant would know he could not control the situation, whereas on the outside, defendant would take advantage of persons he knew he could control. Thus, Macomber corroborated the testimony of the defense psychiatrist, Dr. Aaron, that defendant would make a satisfactory adjustment to prison life. Since the only question before the jury at the penalty phase was whether defendant should be sentenced to death or to life imprisonment without possibility of parole, Macomber's prediction of future criminality should defendant be released was of little importance compared to his concession that defendant could adjust, at least "in a rough way," to prison life.

Even if Macomber's testimony had been excluded from the prosecution's penalty phase case in chief, it would have been admissible as rebuttal to the testimony of the defense experts, Dr. Podboy and Dr. Aaron. (*People* v. *Boyd, supra,* 38 Cal.3d 762, 776.) Moreover, Macomber's testimony cannot be deemed prejudicial on the theory it necessitated the presentation, in response, of Podboy's and Aaron's testimony regarding defendant's psychological makeup and propensities, including his adaptability to prison life. This is so because Podboy's and Aaron's testimony was clearly favorable to defendant, and therefore it is not reasonably possible that withholding both their testimony and Macomber's testimony from the jury would have affected the penalty verdict.

## XIII. HEARSAY IN TESTIMONY OF DEFENSE EXPERTS ON CROSS-EXAMINATION

 During the cross-examination of Dr. Podboy, the prosecutor asked if the witness had a report by a Dr. Dean. Defense counsel objected to questions based on material in the report concerning acts of violence as beyond the scope of the direct examination. The court sustained the objection "as to questions of acts of violence referred to in the reports" and told the prosecutor: "Only ask him about his conclusion with regard to his [defendant's] conduct in relation to intelligence factors."

Resuming the cross-examination, the prosecutor referred to a statement by Dr. Dean that defendant's "behavior problem was—seemed to have little relationship to the mental dullness, was more related to attitude and values; it was probable that he had attached positive values to aggressiveness and violence and to dominating others to enhance his self esteem." The prosecutor asked: "Do you have any quarrel with that or disagreement?" Podboy answered: "*No, just placing in context.* He said in the sentence immediately preceding that, repeated psychometric tests show to be failing at high grade defective levels; further, he has a severe handicap in reading out of propor-

tion to mental retardation." (Italics added.) The prosecutor, in cross-examining Dr. Aaron, also made a passing reference to Dean's "impression of [defendant] as indicating aggressive behavior disorder." Finally, the prosecutor argued to the jury that Dean had indicated that defendant's behavior was related not to his intelligence but more to his attitude and values.

Defendant now contends that since he did not have an opportunity to cross-examine Dean, the court should have either excluded the references to his report or should have given, sua sponte, an instruction that Dean's statements should be considered not for the truth of their contents but only to test the credibility of the witnesses on the stand (Evid. Code, § 721). The contention must be rejected for two reasons. First, Podboy in effect adopted Dean's conclusion as his own. Second, the court was not required to instruct the jury to consider the Dean report for only a limited purpose because no such instruction was requested. (Evid. Code, § 355; *People* v. *Robertson, supra,* 33 Cal.3d 21, 62, fn. 3; *People* v. *Collie* (1981) 30 Cal.3d 43, 63 [177 Cal.Rptr. 458, 634 P.2d 534, 23 A.L.R.4th 776].)

Defendant also complains of certain institutional reports of defendant's adjustment or conduct in school or prison, which the prosecutor read to Aaron on cross-examination and referred to in arguing to the jury that defendant's criminality resulted not from lack of opportunity but from antisocial attitudes. Those reports too were properly disclosed to the jury as matter relied on by Aaron in forming his opinions (Evid. Code, § 721). Similarly, no instruction to limit their use was required since none was requested. The jury argument related to issues addressed by the testimony of defendant's expert witnesses and thus would have been proper even if a limiting instruction had been given.

On cross-examination, the prosecutor asked Aaron what defendant had told him about the crimes he was charged with. Defense counsel objected that the question was beyond the scope of the direct examination (in which the circumstances of the crimes had not been mentioned) and would violate defendant's privilege against self-incrimination. During a hearing outside the presence of the jury, Aaron conceded that he had relied "to some extent" on all his interviews with defendant in forming an opinion as to defendant's personality. The objection was overruled, and Aaron described defendant's account of the crimes.

In claiming error, defendant relies on decisions excluding statements of a defendant to a psychiatrist appointed by the court: *People* v. *Arcega* (1982) 32 Cal.3d 504, 520-523 [186 Cal.Rptr. 94, 651 P.2d 338], and *People* v. *Lines* (1975) 13 Cal.3d 500, 516 [119 Cal.Rptr. 225, 531 P.2d 793]. But those exclusionary principles do not apply to a defendant's statements made

to an expert retained by the defense, if the statements were relied upon in forming opinions to which the expert testified when called as the defendant's own witness. To the contrary, such statements are not privileged and are a proper subject of cross-examination. (*People* v. *Mazoros* (1977) 76 Cal.App.3d 32, 46-47 [142 Cal.Rptr. 599]; *People* v. *Whitmore* (1967) 251 Cal.App.2d 359, 366 [59 Cal.Rptr. 411].)

Moreover, the testimony in question was not prejudicial. The only prejudice claimed by defendant is based on the words which Aaron testified were used by defendant to describe what happened while he was holding the shotgun aimed at Ms. Neidig's head: "I just shot her." Defendant argues that these words are inconsistent with his testimony that the gun went off when Karen grabbed it, hitting Ms. Neidig with the barrel, because the jury could have concluded from that testimony, consistently with a first degree verdict based on felony murder and on a felony-murder special circumstance, that the killing was accidental.

There are two answers to that argument. First, the remark to Aaron was not the only extrajudicial statement contradicting the accidental-killing theory. At the guilt phase, a deputy sheriff testified that while he was escorting defendant from the courtroom to a cell, defendant accused the previous evening's news broadcast of lying because "I didn't rape no one. *I shot the lady like they said* but didn't rape no two women." (Italics added.) Secondly, the jury's finding of a special circumstance that the killing was "for the purpose of avoiding or preventing a lawful arrest," though set aside herein because of the absence of any threat of arrest in the reasonably near future, is at least as inconsistent with any accidental killing as is defendant's statement to Aaron, "I just shot her." There is no reasonable possibility that withholding that statement from the jury would have changed the penalty verdict.

## XIV. Refusal to Instruct That First Degree Murder Conviction Is Not in Itself an Aggravating Factor

■ Defendant requested an instruction that in determining the penalty the jury should "weigh the mitigating circumstances against the aggravating circumstances that you find to be established by the evidence," and "[t]he fact that you have found [defendant] guilty beyond a reasonable doubt of the crime of murder in the first degree is not itself an aggravating circumstance." The request was properly denied since the requested instruction was unnecessary and possibly misleading. There appeared no need to tell the jury that the murder conviction in the abstract, as distinct from the circumstances of the murder, is not an aggravating factor since no one had suggested otherwise. More seriously, the requested instruction might

have been understood as a contradiction of the instruction properly given, that the jury should consider the statutory aggravating and mitigating factors, including the "circumstances of the crime of which the defendant was convicted in the present proceeding" (§ 190.3, factor (a)).

Defendant argues the requested instruction was necessary because it would be constitutionally improper for the jury to rely on the circumstances underlying a first degree *felony*-murder conviction to justify not only the conviction itself but also a special circumstance and aggravating factor sufficient for the death penalty. ▌ To the contrary, it is now established that the 1978 death penalty law makes the felony murderer, if the actual killer, death-eligible and does not thereby violate either the Eighth Amendment or the equal protection clause. (*People v. Anderson, supra,* 43 Cal.3d 1104, 1147; see *Lowenfield v. Phelps* (1988) 484 U.S. 231, 244 [98 L.Ed.2d 568, 581, 108 S.Ct. 546] [death sentence does not violate Eighth Amendment simply because the single statutory "aggravating circumstance" found by the jury duplicates an element of the underlying offense of first degree murder].)

## XV. AGE AS AN AGGRAVATING FACTOR

▌ The court instructed the jury that in determining the penalty they should consider "the following factors, if applicable." Among the factors listed was the "age of the defendant at the time of the crime" (§ 190.3, factor (i)). The testimony of Dr. Aaron indicated that defendant was born in January 1958 and was therefore 22 at the time of the murder. The prosecutor referred to the factor of age and argued that (1) defendant was not too young or inexperienced to know what the law was and (2) "his age and his strength made him physically superior to his victims, and I think that's a factor to consider, that he was completely intimidating [Karen] and, obviously, the ladies and Karen were no match for his strength and his age." Defendant contends he was prejudiced because the jury was permitted to consider his age as an aggravating factor, whereas it should be considered, if at all, only in mitigation.

We recently held that mere chronological age of itself, being a factor over which one can exercise no control, should be deemed neither an aggravating nor a mitigating factor. Instead, the inclusion of "[t]he age of the defendant at the time of the crime" in the factors to be considered in determining the penalty (§ 190.3, factor (i)) permits either counsel to argue "any age-related matter suggested by the evidence or by common experience or morality that might reasonably inform the choice of penalty." (*People v. Lucky* (1988) 45 Cal.3d 259, 302 [247 Cal.Rptr. 1, 753 P.2d 1052].) Accordingly, defendant's contention that his age could be considered only in mitigation is rejected.

## XVI. Instructions on Inapplicable Mitigating Factors

 The trial court instructed the jury to consider all the aggravating and mitigating factors which section 190.3 directs the trier of fact to take into account "if relevant" in determining the penalty. Defendant contends that the instruction should have omitted, as clearly not relevant, the following four factors specified in section 190.3: (e) (participation or consent of victim), (f) (moral justification or extenuation reasonably believed by defendant), (g) (defendant under extreme duress or substantial domination), and (j) (defendant's participation limited to minor role as accomplice).

The instruction told the jury to consider the factors only "if applicable" to the case. As we recently held, the jury is capable of deciding for itself which factors are "applicable" in a particular case, and the instruction was therefore appropriate. (*People* v. *Miranda* (1987) 44 Cal.3d 57, 104-105 [241 Cal.Rptr. 594, 744 P.2d 1127]; *People* v. *Ghent, supra,* 43 Cal.3d 739, 777.)

 Defendant contends that even if the instruction was proper, he was prejudiced by prosecution arguments that the *absence* of each of the four factors constituted an aggravating factor. The prosecutor commenced his argument by indicating that the jury should be guided by all of the section 190.3 factors "if you feel them to be applicable in this case." He then took up each factor seriatim. His comments on each of the factors challenged here were as follows: Factor (e): "Was the victim participating in any way in this conduct or consented [*sic*] in any way? No, she was killed trying to defend her own home and her arms were full of—she had her purse and briefcase and the grocery bag, or the paper bag with the dinner in it." Factor (f): "Did the defendant have a reasonable belief that he was morally justified in what he did? I think not. This is not a case where someone is killed on a mistaken belief or unreasonable belief that he's acting for some higher purpose, like defending a friend or family or something like that. This was a killing simply done to carry out his original plan, and that was to steal from the ladies." Factor (g): "Was he acting under any extreme duress or domination of another person? I think that factor is somewhat ironic in this case. It was obvious that he was the one that had the ladies under duress and under his domination." Factor (j): "Obviously he wasn't an accomplice, he was the only person that was involved in this case, and he is responsible." The argument contained no further express references to these factors.

Although "[w]e recently held [in *People* v. *Davenport* (1985) 41 Cal.3d 247, 288-290 (221 Cal.Rptr. 794, 710 P.2d 861),] that 'in the future' prosecutors should refrain from arguing to the jury that the very absence of a mitigating factor would constitute an aggravating one to be weighed against

the defendant" (*People* v. *Ghent, supra,* 43 Cal.3d 739, 775), "[n]o good reason appears for depriving the prosecutor of the opportunity to argue that certain other otherwise mitigating factors are not present in the case [citing *People* v. *Rodriguez* (1986) 42 Cal.3d 730, 790 (230 Cal.Rptr. 667, 726 P.2d 113)]" (*ibid.*). Here, "[t]he prosecutor simply observed in his jury argument that many of the statutory mitigating factors were inapplicable to this case. This is not an unfair or improper technique, given defense counsel's opportunity to assert appropriate contrary argument and analysis." (*People* v. *Ruiz* (1988) 44 Cal.3d 589, 620 [244 Cal.Rptr. 200, 749 P.2d 854].)

## XVII. CLAIM THAT INSTRUCTIONS PRECLUDED JURY CONSIDERATION OF DEFENDANT'S BACKGROUND AND MENTAL DEFECTS

 The instructions told the jury to "consider all of the evidence which has been received during any part of the trial of this case, except as you may be hereafter instructed," and to "consider, take into account and be guided by the following factors, if applicable." There followed a description of factors that closely tracked those in section 190.3, including factor (k), "any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime."

Defendant contends that these instructions told the jury to consider only those mitigating circumstances which related to the crime itself and precluded their consideration of other mitigating evidence of defendant's character and background even though such consideration is required by the holdings in *Eddings* v. *Oklahoma* (1982) 455 U.S. 104, 113-114 [71 L.Ed.2d 1, 10-11, 102 S.Ct. 869] and *Lockett* v. *Ohio* (1978) 438 U.S. 586, 604-605 [57 L.Ed.2d 973, 989-990, 98 S.Ct. 2954]. In *People* v. *Easley* (1983) 34 Cal.3d 858, 878, footnote 10 [196 Cal.Rptr. 309, 671 P.2d 813], we held, in light of *Eddings* and *Lockett,* that "in the future, trial courts—in instructing on the factor embodied in section 190.3, subdivision (k) [factor (k)]—should inform the jury that it may consider as a mitigating factor 'any circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime' and any other 'aspect of [the] defendant's character or record . . . that the defendant proffers as a basis for a sentence less than death' [citing *Lockett*]." We subsequently held that the assessment of prejudice from the lack of this expanded factor (k) instruction in cases where, as here, the trial was held prior to the filing of *Easley,* should turn on "the totality of the penalty instructions given and the arguments made to the jury" (*People* v. *Davenport, supra,* 41 Cal.3d 247, 286). In *People* v. *Rodriguez, supra,* 42 Cal.3d 730, 786, we noted that in that pre-*Easley* trial, "no other instructions given the jury either aggravated or mitigated the misleading effect of the factor (k) instruction," and held that there was no prejudice

because "the prosecutor . . . took pains to advise the jury of its true responsibility." In *California* v. *Brown* (1987) 479 U.S. 538 [93 L.Ed.2d 934, 107 S.Ct. 837] Justice O'Connor, one of the five justices who signed the majority opinion, filed a concurring opinion declaring, "On remand, the California Supreme Court should determine whether the jury instructions, taken as a whole, and considered in combination with the prosecutor's closing argument, adequately informed the jury of its responsibility to consider all of the mitigating evidence introduced by the [defendant]." (*Id.* at p. 546 [93 L.Ed.2d at p. 943, 107 S.Ct. at p. 842]; see *People* v. *Ghent, supra,* 43 Cal.3d 739, 777.)

Here, the prosecutor made clear at the outset that "the jury must consider not only the crime committed, the circumstances of the crime, but the character and background of the defendant." He went on: "The court will tell you you shall consider all the evidence that you have heard not only in the trial on the question of guilt but also in this part of the trial, and you will be considering and taking into account and guided by the following factors if you feel them to be applicable in this case: . . ." Throughout the argument the prosecutor made numerous references to defendant's evidence of his psychological problems, deprived childhood, and institutional behavior, and though the prosecutor argued vigorously against the weight of that evidence as mitigation, he at no time intimated that the evidence should not be considered. Accordingly, there is no reasonable possibility that the court's pre-*Easley* instructions misled the jury about the factors and evidence it should consider in its penalty determination. ■■■■ (*People* v. *Robbins* (1988) 45 Cal.3d 867, 886-887 [248 Cal.Rptr. 172, 755 P.2d 355]; *People* v. *Grant* (1988) 45 Cal.3d 829, 854-855 [248 Cal.Rptr. 444, 755 P.2d 894]; *People* v. *Allen, supra,* 42 Cal.3d 1222, 1276; *People* v. *Rodriguez, supra,* 42 Cal.3d 730, 786-787.)[3]

## XVIII. CLAIMED OVERLAP OF FACTOR (a) (CIRCUMSTANCES OF CRIME) AND FACTOR (b) (VIOLENT CRIMINAL ACTIVITY)

■■■ The jury was instructed to consider both "[t]he circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstances found to be true" (§ 190.3, factor (a)); and "[t]he presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the expressed or implied threat to use force or violence" (§ 190.3, factor (b)).

---

[3] In his supplemental brief, defendant contends for the first time that photographs of the victim's body, admitted over objection at the guilt phase, "impaired the jury's ability to apply the instructions to [defendant's] mitigating evidence." Though relevant to factor (a) (circumstances of the crime), the photographs were not referred to in the penalty phase closing arguments. There appears no factual or legal basis for defendant's speculative claim.

Defendant claims he was prejudiced because the court did not modify factor (b) to make clear that it referred to criminal activity other than the present crime.

 The only criminal activity that the jury could properly consider under factor (b) was defendant's conduct in connection with the rape and robbery of Linda D. in 1976. (*People* v. *Melton, supra,* 44 Cal.3d 713, 763; *People* v. *Miranda, supra,* 44 Cal.3d 57, 105-106.) The trial judge strongly suggested that limitation when, in instructing on the requirement of proving criminal activity beyond a reasonable doubt, he added that "here is what the court is talking about" and explained that the instruction was "in regards to the testimony of the woman in regards to the alleged rape that she testified to." (Cf. *People* v. *Rodriguez, supra,* 42 Cal.3d 730, 787.) Nothing in the prosecutor's argument stated or implied that the circumstances of the murder should be considered both under factor (a) and as criminal activity under factor (b). The argument simply analyzed the relevant evidence without undertaking to assign weight to it under a particular factor. There was no prejudice. (*People* v. *Melton, supra,* 44 Cal.3d 713, 763-764; *People* v. *Miranda, supra,* 44 Cal.3d 57, 105-106.)

## XIX. Instruction That Death Penalty Is Mandatory if Aggravating Outweigh Mitigating Circumstances

 The jury was instructed, in accordance with section 190.3: "If you conclude that the aggravating circumstances outweigh the mitigating circumstances, you shall impose a sentence of death." Defendant contends that this instruction precluded the jury from exercising its sentencing discretion as required by the Eighth Amendment. In *People* v. *Brown* (1985) 40 Cal.3d 512, 538-545 [220 Cal.Rptr. 637, 709 P.2d 440] (revd. on other grounds, 479 U.S. 538 [93 L.Ed.2d 934, 107 S.Ct. 837]), we held that section 190.3 must be interpreted as directing determination of the penalty not on the basis of any mechanical formula, but through a balancing process in which each juror assigns to each factor the weight that he or she deems appropriate and decides which penalty is appropriate under all the circumstances. (40 Cal.3d at p. 541.) We further held that in subsequent trials, the jury should be instructed in accordance with the principles we were announcing, and that prior cases must be examined to determine whether, in context, the sentencer may have been misled to defendant's prejudice concerning the proper scope of its sentencing discretion. (*Id.* at p. 544, fn. 17.)

 Here, we are satisfied that the jury was not misled. In addition to using the language quoted above, the court gave the following instruction at defendant's request: "In weighing the aggravating and mitigating factors

you are not merely to count numbers on either side, you are instructed, rather, to weigh and consider the factors on each side as a whole." Moreover, the prosecutor, immediately after repeating the statutory language making the penalty determination depend on whether aggravating factors outweigh mitigating factors or vice versa, added: "In effect you are expressing the conscience of the community on this ultimate question, and the Supreme Court has said that you are the link between community values and the penal system in this kind of situation." There were no other statements, in either the instructions or the arguments, that might have misled the jury as to its sentencing discretion. We conclude that under all the circumstances, there is no reasonable possibility the jury was misled in this regard. (*People* v. *Melton, supra,* 44 Cal.3d 713, 761; *People* v. *Miranda, supra,* 44 Cal.3d 57, 103-104; *People* v. *Allen, supra,* 42 Cal.3d 1222, 1276-1280.)

## XX. CLAIMED ERRORS IN TRIAL JUDGE'S STATED REASONS FOR REFUSING TO MODIFY PENALTY VERDICT

■■■ Whenever the jury returns a verdict imposing the death penalty, the defendant is deemed to have applied for modification of the verdict. "In ruling on the application, the judge shall review the evidence, consider, take into account, and be guided by the aggravating and mitigating circumstances referred to in Section 190.3, and shall make a determination as to whether the jury's findings and verdicts that the aggravating circumstances outweigh the mitigating circumstances are contrary to the law or the evidence presented. The judge shall state on the record the reasons for his findings." (§ 190.4, subd. (e).) The judge must determine independently whether the weight of the evidence supports the verdict. (*People* v. *Heishman* (1988) 45 Cal.3d 147, 200 [246 Cal.Rptr. 673, 753 P.2d 629]; *People* v. *Rodriguez, supra,* 42 Cal.3d 730, 793-794.)

■■■ The present trial judge denied defendant's automatic application for modification and stated his reasons on the record, analyzing each of the statutory aggravating and mitigating factors in the order in which they appear in section 190.3. Defendant contends that the judge's stated reasons displayed erroneous views of the law and that defendant was thereby denied a proper determination of the application.

As to factor (a), circumstances of the crime, the judge found that based on defendant's admissions to Karen, the defendant had observed Ms. Neidig and Ms. Prendergast at the dog show in San Francisco, and came to their home for the purpose of stealing its contents. Defendant argues that this finding is erroneous because the judge failed to weigh the evidence that defendant arrived unarmed and on foot, and thus unprepared for using

armed force or readily escaping with stolen goods, and that he correctly identified himself to all to whom he spoke immediately prior to his arrival. The judge was not, however, required to recount all the evidence, and it cannot be presumed from his failure to mention particular evidence that he did not consider it.

Under factor (b), the presence or absence of violent criminal activity by defendant, the judge considered the stabbings of Ms. Prendergast and Karen. The judge's determination took place long before our holding in *People v. Melton, supra,* 44 Cal.3d 713, 763, "that the term 'criminal activity [involving] force or violence' as used in [factor (b) of section 190.3] is limited to conduct other than the immediate circumstances for which the death penalty is being contemplated [citing *People v. Miranda, supra,* 44 Cal.3d 57, 105-106]." (*People v. Melton, supra,* 44 Cal.3d 713, 763.) It is true that the judge, in noting that factor (a) refers to the "circumstances of the *crime* of which the defendant was convicted in the present proceeding" (italics added), could have concluded that factor (b) encompassed violent criminal activity other than the murder itself. But there is no indication or likelihood that he gave the stabbings any undue weight by attaching them to more than one aggravating factor.

Defendant argues that the judge erroneously treated the absence of mitigating factors as constituting aggravation. (See *People v. Melton, supra,* 44 Cal.3d 713, 769; *People v. Rodriguez, supra,* 42 Cal.3d 730, 789-790 [mere absence of evidence of statutory mitigating factor is not itself an aggravating factor].) He points to the judge's discussion of factor (f), whether or not the offense was committed under circumstances which the defendant reasonably believed to be a moral justification or extenuation for his conduct. The judge declared there was "not a scintilla of evidence" to support the existence of such belief, and asked rhetorically, how could one justify killing an innocent, unsuspecting victim coming into her own home? The judge could, of course, properly consider these objective circumstances of the killing under factor (a), as ones pertaining to the crime, and there is no suggestion that he gave them additional weight simply because he perceived an absence of the justificatory belief that would be essential to mitigation under factor (f).

Defendant also criticizes the judge's conclusions that "there was no . . . convincing testimony . . . that the defendant's intelligence level was a factor in the crimes of which he stands convicted," and (in connection with factor (h)) that the psychiatrist's testimony showed that defendant's "capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was not impaired as a result of mental defect." Defendant argues that the judge failed to consider, in mitigation, aspects of

defendant's character and background that did not directly relate to the present crimes. But the judge expressly specified, as relevant to factor (k) (other circumstances extenuating the gravity of the crime), "the testimony of the psychologists and the psychiatrist . . . relating to [defendant's] family and his youth and upbringing." Moreover, in connection with factor (d) (whether the offense was committed under the influence of extreme mental or emotional disturbance), the judge outlined the evidence of defendant's deprived childhood, and concluded it did not excuse the criminal conduct for which he stood convicted.

Accordingly, the judge's statement of reasons appears free from any defects which would undermine the validity of the determination upon which he denied the application for modification of the verdict under section 190.4, subdivision (e).

## XXI. Constitutionality of Sentencing Procedures Under 1978 Death Penalty Statute

■ Defendant contends that the procedures for imposing the death penalty prescribed by the 1978 law (fn. 1, *ante*) are unconstitutional in that they lack certain procedural safeguards. Identical claims were considered and rejected by this court in *People* v. *Rodriguez, supra,* 42 Cal.3d 730, 777-779.

## XXII. Disproportionality of Death Sentence

■ Defendant contends his death sentence must be set aside as disproportionate. Though apparently conceding that disproportionality review is not required by the federal Constitution (*Pulley* v. *Harris* (1984) 465 U.S. 37, 51-53 [79 L.Ed.2d 29, 41-42, 104 S.Ct. 871]; *People* v. *Rodriguez, supra,* 42 Cal.3d 730, 777-779), he contends his sentence should be held disproportionate under article I, section 17, of the California Constitution, as interpreted in *People* v. *Dillon* (1983) 34 Cal.3d 441, 477-489 [194 Cal.Rptr. 390, 668 P.2d 697], and *In re Lynch* (1972) 8 Cal.3d 410 [105 Cal.Rptr. 217, 503 P.2d 921]. It is clear from the present record that the sentence is not disproportionate under those standards. (See *People* v. *Melton, supra,* 44 Cal.3d 713, 771; *People* v. *Miranda, supra,* 44 Cal.3d 57, 118.)

## XXIII. Contentions as to Prison Sentences

Defendant claims errors in the prison sentences imposed for his crimes other than murder. As already explained, two of these were crimes against Jean Prendergast: assault with intent to commit murder (former § 217; count two) and assault with a deadly weapon and by means likely to pro-

duce great bodily injury (§ 245, subd. (a); count three). Four were offenses committed against Karen: rape by force and threats (former § 261, subds. 2, 3; count four), assault with intent to murder (former § 217; count five), assault with a deadly weapon and by means likely to produce great bodily injury (§ 245, subd. (a); count six), and robbery (§ 211; count seven). Count eight was burglary of the Neidig-Prendergast residence (§ 459).

Defendant was sentenced to the upper term on all seven of these counts, but execution of the sentences on counts three, six, and eight was stayed under section 654, and parts of the sentences on counts five and seven were stayed in accordance with section 1170.1. It was ordered that defendant serve a consecutive full term on count two (as the principal term under § 1170.1), consecutive subordinate terms (i.e, one-third of each middle term) on counts five and seven, and a full consecutive term on count four (rape). Three-year enhancements were added to count two for infliction of great bodily injury (§ 12022.7) and to count four for personal use of a deadly weapon (§ 12022.3), and an additional three-year enhancement was imposed for the prior imprisonment for a violent felony (§ 667.5, subd. (a)). The stayed sentences also included enhancements.

A. *Failure to Explain Full Consecutive Sentence for Rape*

Defendant contends that since a full consecutive sentence was imposed on count two (assault with intent to murder Prendergast) as the principal term under section 1170.1, it was error to impose a separate consecutive sentence, consisting of the full upper term of eight years plus a three-year enhancement for use of a deadly weapon (§ 12022.3), on count four (forcible rape). Section 667.6, subdivision (c) (hereafter § 667.6(c)) provides, however, that "[i]n lieu of the term provided in Section 1170.1, a full, separate, and consecutive term may be imposed for each violation of" enumerated sex offenses, including forcible rape as charged in count four. The trial court correctly rejected defense counsel's argument that section 667.6(c) does not apply to a defendant being sentenced for only one of the enumerated sex offenses. (*People v. Jones* (1988) 46 Cal.3d 585 [250 Cal.Rptr. 635, 758 P.2d 1165].)

There is merit, however, in defendant's contention that the sentence must be set aside because the court failed to give reasons for invoking section 667.6(c). In *People v. Belmontes* (1983) 34 Cal.3d 335 [193 Cal.Rptr. 882, 667 P.2d 686], the trial court imposed a middle base term for kidnapping plus full consecutive six-year sentences on each of three convictions of sex offenses enumerated in section 667.6(c), reciting reasons appropriate to a decision to impose consecutive rather than concurrent terms under section 1170.1 but failing to explain why the court chose to sentence under section

667.6(c). We remanded for resentencing, holding that separate reasons must be given for that choice, which should be based on the criteria provided in California Rules of Court, rule 425 and related rules promulgated under section 1170.3.[4] (34 Cal.3d at pp. 347-349.) Here, resentencing is necessitated by the lack of the separate statement of reasons required by *Belmontes* for imposing a separate full consecutive sentence on count four under section 667.6(c).

### B. *Imposition of Consecutive Sentences on Counts Five and Seven (Assault and Robbery of Karen) in Light of Section 654*

■■■ Defendant contends that under section 654, which prohibits multiple punishment for the same act or omission, he cannot be sentenced for both the assault with intent to murder Karen (count five) and the robbery of the same victim (count seven). ■■■ "Section 654 does not preclude multiple convictions but only multiple punishments for a single act or indivisible course of conduct. (See *People* v. *Beamon* (1973) 8 Cal.3d 625 [105 Cal.Rptr. 681, 504 P.2d 905].)" (*People* v. *Miller* (1977) 18 Cal.3d 873, 885 [135 Cal.Rptr. 654, 558 P.2d 552].) ■■■ "The proscription against double punishment in section 654 is applicable where there is a course of conduct which . . . comprises an indivisible transaction punishable under more than one statute . . . . The divisibility of a course of conduct depends upon the intent and objective of the actor, and if all the offenses are incident to one objective, the defendant may be punished for any one of them but not for more than one." (*People* v. *Bauer* (1969) 1 Cal.3d 368, 376 [82 Cal.Rptr. 357, 461 P.2d 637, 37 A.L.R.3d 1398].) "The defendant's intent and objective are factual questions for the trial court; [to permit multiple punishments,] there must be evidence to support a finding the defendant formed a separate intent and objective for each offense for which he was sentenced. [Citation.]" (*People* v. *Adams* (1982) 137 Cal.App.3d 346, 355 [187 Cal.Rptr. 505].)

■■■ There is ample evidence to support the trial court's implicit finding that defendant's intent and objective in assaulting Karen, by stabbing her, was separate from, rather than incidental to, his intent and objective in committing the robbery. Prior to the assault, defendant had essentially completed the robbery by compelling Karen to assist and not interfere with his gathering the valuables and preparing for flight. Ms. Neidig then entered the kitchen, and defendant killed her with the shotgun. He next ordered Karen to lie down and stabbed her in the back. The trial court could properly conclude that defendant committed the assault with the intent and objective of preventing the victim from sounding the alarm about

---

[4] All subsequent references to a rule are to the California Rules of Court.

the murder, and that this intent and this objective were separate from, not incidental to, the robbery. (*People* v. *Ford* (1966) 65 Cal.2d 41, 47-49 [52 Cal.Rptr. 228, 416 P.2d 132]; *In re Chapman* (1954) 43 Cal.2d 385, 388-390 [273 P.2d 817]; see *People* v. *Beamon, supra,* 8 Cal.3d 625, 639, fn. 12.)

C. *Improper Reliance on Same Facts for Different Sentencing Purposes*

 *(1) Same Facts Used for Upper Terms and Consecutive Terms.* Rule 425 lists the following among the factors justifying consecutive sentences under section 1170.1: that the crimes "were predominantly independent of each other" (rule 425(a)(1)), "involved separate acts of violence" (rule 425(a)(2)), or "involved multiple victims" (rule 425(a)(4)); and "[a]ny circumstances in aggravation or mitigation" (rule 425(b)). Circumstances in aggravation and in mitigation, used in setting upper or lower terms (rule 405(d), (e)), are listed in rules 421 and 423. A trial court may not use the same fact to impose both an upper term and a consecutive sentence. (§ 1170, subd. (b) [forbidding dual use of a fact to impose both an upper term and an enhancement "under Section . . . 1170.1 . . ."]; rule 441; *People* v. *Avalos* (1984) 37 Cal.3d 216, 233 [207 Cal.Rptr. 549, 689 P.2d 121]; *People* v. *Ratcliffe* (1981) 124 Cal.App.3d 808, 821 [177 Cal.Rptr. 627]; *People* v. *Lawson* (1980) 107 Cal.App.3d 748 [165 Cal.Rptr. 764].)

The present trial court's stated reasons for imposing consecutive sentences on defendant were "that the crimes involved multiple victims, and that the court considered circumstances in aggravation and mitigation. While the crimes were committed closely in period of time and proximity, the crimes basically involved separate acts of violence." The court's reliance on the "circumstances in aggravation and mitigation" for the imposition of consecutive sentences was improper because those circumstances were also relied on for imposing the upper terms.

 *(2) Prior Felony Conviction Used for Upper Term on Every Count and Also to Impose Enhancement for Conviction of a Prior Violent Felony.* Section 667.5, subdivision (a), provides generally that a separate three-year term shall be imposed if the defendant is convicted of any "violent felony" and also has served a prior prison term for a violent felony. Each of defendant's convictions on counts two through eight constituted a violent felony since that term includes both forcible rape and any felony in which the defendant has been found under section 12022.7 to have inflicted great bodily injury. (§ 667.5, subds. (c)(3), (c)(8).) Because defendant had served a prior prison term for the forcible rape of Linda D., he was sentenced to an additional three years under section 667.5.

The trial court relied on that same prior prison term, including the fact that defendant was still on parole under that term at the time of the present crimes, in selecting the upper terms on counts two through eight. Defendant contends, and we agree, that the court thus violated rule 441(c), which provides: "A fact used to enhance the defendant's prison sentence may not be used to impose the upper term." ▇▇ Rule 421(b)(3), which lists "prior prison terms whether or not charged or chargeable as an enhancement under section 667.5" as an aggravating factor supporting an upper term, makes clear that an additional sentence under section 667.5 is an enhancement under the sentencing rules. The mandatory nature of such an enhancement, though immunizing it from being stricken under rule 441(b), does not preclude applicability of the rest of the sentencing rules. (See *People* v. *Bejarano* (1981) 114 Cal.App.3d 693, 706 [173 Cal.Rptr. 71].) ▇▇ Rule 441(c)'s prohibition of dual use of facts applied to the sentencing of defendant on count four under section 667.6(c) (*People* v. *Reeder* (1984) 152 Cal.App.3d 900, 919-921 [200 Cal.Rptr. 479]; see *People* v. *Belmontes, supra,* 34 Cal.3d 335, 346-348) as well as to the sentencing on the other counts (§ 1170, subd. (b); *People* v. *Calhoun* (1981) 125 Cal.App.3d 731 [178 Cal.Rptr. 396]; *People* v. *Jardine* (1981) 116 Cal.App.3d 907, 923-924 [172 Cal.Rptr. 408]).

▇▇ There is no merit, however, in defendant's alternative contention that the instructions and argument allowing and urging the jury to rely on defendant's prior felony conviction as an aggravating factor in reaching their death penalty verdict (§ 190.3, factor (c)), and the court's reliance on that factor in denying modification of the penalty verdict (§ 190.4, subd. (e)), precluded a prison sentence enhancement based on the prior prison term. The same fact may be relied on both as an aggravating factor in determining whether to impose the death penalty and as an enhancement of a prison sentence which is imposed for another crime and is to be served in the event the death penalty is not carried out.

*(3) Great Bodily Injury Relied on for Both the Upper Term and the Enhancement in Count Two.* In sentencing on count two (assault with intent to murder Ms. Prendergast), the trial court added a three-year enhancement under section 12022.7, applicable to "[a]ny person who, with the intent to inflict such injury, personally inflicts great bodily injury . . . unless [such] infliction . . . is an element of the offense of which he is convicted." In selecting the upper term, the trial court cited as aggravation, "that the crime involved great violence, great bodily harm, acts disclosing a high degree of cruelty, viciousness and callousness," thereby using "a fact charged and found as an enhancement" to impose the upper term (rule 441(b)). Rule 441(b) provides that such a fact "may be used to impose the upper term," but that if it is, "the additional term of imprisonment pre-

scribed for that fact as an enhancement shall be stricken. The use of the fact to impose the upper term is an adequate reason for striking the additional term of imprisonment."

It is not necessary for us to order the enhancement stricken pursuant to this rule because, as shall be explained, the case must be remanded in any event for resentencing on counts two through eight, and it is not certain that the new sentence will include an upper term based on a fact charged and found as an enhancement.

■■ *(4) Enhancing Sentence on Count Four (Rape) for Personal Use of a Deadly Weapon While Also Citing, as Justification for the Upper Term, a "Great Threat of Bodily Harm" When the Threat May Have Consisted Solely of Keeping the Weapon Within Reach.* The sentence on count four (rape) was enhanced three years for personal use of a deadly weapon (§ 12022.3). In choosing the upper term on count four, the court said: "The crime involved great violence, a great threat of bodily harm and a high degree of viciousness and callousness; the victim was particularly vulnerable." Defendant contends that this constituted an improper dual use of facts because the only evidence supporting either the "great threat of bodily harm" as an upper-term factor or the weapon-use enhancement was that defendant placed the knife where it was within his reach during the act.

In *People* v. *Alvarado* (1982) 133 Cal.App.3d 1003 [184 Cal.Rptr. 483], certain defendants were convicted of attempted robbery, involving personal use of a firearm (§ 12022.5), on evidence they had taken property at gunpoint. (*Id.* at pp. 1010-1012.) The court imposed upper terms, citing as one of two aggravating factors, "great violence/threat of great bodily harm" (rule 421(a)(1)), and added two years for the firearm use enhancement. (*Id.* at pp. 1012, 1026.) The Court of Appeal remanded for resentencing, holding that the quoted aggravated factor was impermissible under rule 441(c) (prohibiting dual use of a fact for an enhancement and an upper term) because the evidence conclusively showed that it was only the presence of firearms that justified the finding of a threat of great bodily harm. (*Id.* at p. 1028. Accord: *People* v. *Calhoun, supra,* 125 Cal.App.3d 731, 734; *People* v. *Roberson* (1978) 81 Cal.App.3d 890, 893 [146 Cal.Rptr. 777].)

Here, it is not clear that the threat of great bodily harm depended on the presence of the knife since such a threat might be inferred from the evidence that the victim felt at defendant's mercy because of his superior bodily strength. On remand, the trial court should avoid any reliance on the same fact (e.g., defendant's use of the knife) for both an upper term and an enhancement.

### D. *Necessity for Resentencing*

■ Improper dual use of the same fact for imposition of both an upper term and a consecutive term or other enhancement does not necessitate resentencing if "[i]t is not reasonably probable that a more favorable sentence would have been imposed in the absence of the error." (*People v. Avalos, supra,* 37 Cal.3d 217, 233.) ■ But in the present case, resentencing is required for another reason, i.e., the trial court's failure to give reasons for imposing a full consecutive term on count four under section 667.6(c). (*People v. Belmontes, supra,* 34 Cal.3d 335, 349.) Should the court decide to resentence on count four under section 1170.1 rather than section 667.6(c), sentences on other counts might be affected. Moreover, all of the sentences on counts two through eight were subjects of the trial court's erroneous dual reliance on the same fact or facts. Under these circumstances, the trial court should resentence defendant on all those counts.

### XXIV. CONCLUSION

The finding of the special circumstance that defendant committed the murder in order to avoid or prevent lawful arrest (§ 190.2, subd. (a)(5)) is set aside as unsupported by substantial evidence. Otherwise the judgment convicting defendant of murder and sentencing him to death is affirmed. The prison sentences on counts two through eight are vacated, and the cause is remanded for resentencing on those counts in accordance with this opinion.

Mosk, J., Panelli, J., and Eagleson, J., concurred.

**LUCAS, C. J.**—I concur in the majority's holdings, but write separately regarding the instructions given as to the charge of assault with intent to murder. It is settled law that it is error not to instruct that a defendant must have an "intent to kill" in order to be found guilty of an assault with intent to murder (*People v. Murtishaw* (1981) 29 Cal.3d 733, 763-765 [175 Cal.Rptr. 738, 631 P.2d 446]), but that intent may be "inferable from the circumstances of the crime," and the error may not be prejudicial. (*People v. Ramos* (1982) 30 Cal.3d 553, 584, fn. 13 [180 Cal.Rptr. 266, 639 P.2d 908]; accord, *People v. Croy* (1985) 41 Cal.3d 1, 20 [221 Cal.Rptr. 592, 710 P.2d 392]; see *People v. Montiel* (1985) 39 Cal.3d 910, 926-927 [218 Cal.Rptr. 572, 705 P.2d 1248].)

After undertaking a critical survey of the cases on the subject, the majority nonetheless ultimately 1) expressly adheres to the rule requiring a specific intent to kill for the crimes of assault with intent to commit murder (former Pen. Code, § 217) and of attempted murder and 2) acknowledges that

proper jury instructions should describe the requisite intent as an intent to "kill." (See *ante* at p. 142.) I agree with those conclusions. However, in order to avoid any confusion that might arise from the dicta regarding the relevant precedent, I would omit the unnecessary critique. Given the facts of this case, and the proper focus on intent to kill provided by counsel's arguments, I instead would simply conclude that it is not reasonably probable that the jury would have reached a result more favorable to defendant had it been properly instructed. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

Broussard, J., and Arguelles, J.,* concurred.

Appellant's petition for a rehearing was denied April 26, 1989.

---

* Retired Associate Justice of the Supreme Court sitting under assignment by the Chairperson of the Judicial Council.