Filed 2/11/26  P. v. Davis CA4/3

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, Plaintiff and Respondent, v. REGINALD JAMAL DAVIS, Defendant and Appellant. | G063338 (Super. Ct. No. 19HF1109) O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Lance P. Jensen, Judge. Affirmed.

Bases & Bases and Arielle Bases for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Arlene A. Sevidal, Andrew Mestman and Jon S. Tangonan, Deputy Attorneys General, for Plaintiff and Respondent.

Reginald Jamal Davis appeals from the judgment of conviction entered after a jury found him guilty of several felony counts for, inter alia, assault with intent to commit a sexual offense during the commission of a burglary and kidnapping with intent to commit a sex offense. The court found it to be true Davis suffered prior serious and violent felony convictions. The court imposed a sentence of 75 years to life plus 32 years.

In his opening brief, Davis argues the trial court abused its discretion with respect to a pretrial evidentiary ruling and insufficient evidence supports his convictions with respect to the assault and kidnapping offenses. He also contends the trial court committed several errors in imposing sentence and his total prison sentence constitutes cruel and/or unusual punishment in violation of the Eighth Amendment to the United States Constitution and the California Constitution.

For the reasons we explain, none of Davis's contentions of error has merit. We therefore affirm.

## FACTS

### I.

### DAVIS CHASES AND REPEATEDLY TRIES TO GRAB A FEMALE JOGGER

On August 13, 2019, S.B. was jogging after dark when she sensed someone was behind her. She slowed down, turned around, and saw a man, later identified as Davis, about 10 to 15 feet away; she did not know Davis and had never seen him before.

S.B. heard Davis talking to her but she could not hear what he was saying. Initially, Davis was walking behind her, but when she started to run faster, he started to run toward her. She told him to stop following her. Davis asked her to stop and told her he wanted to talk to her.

2

After Davis came within inches of S.B. and twice tried to grab her, she ran into traffic in the middle of the street. He followed her and continued to try and grab her as she tried to run away from him.

S.B. told Davis she was going to call the police. He told her not to call the police but to instead talk to him. She continued to try to get away from him by weaving between cars and trying to get a car to stop and help her; meanwhile, he continued to pursue her and repeatedly told her to stop. A couple of cars stopped and S.B. got into one of them. The driver of that car called 911. Davis punched the front of that car. S.B. thought Davis was drunk.

## II.

### DAVIS BREAKS INTO M.R.'S NEARBY RESIDENCE

A short distance from where the jogger had escaped Davis, around 8:30 p.m. later that evening, then 88-year-old M.R. was alone watching television in her family room when she noticed the outdoor motion sensor patio lights turn on. M.R. stood up to investigate and looked in the direction of the glass French doors where she saw a man, later identified as Davis, standing outside trying to open the doors. M.R. had never seen Davis before. Davis looked at M.R., "kind of smiled," and waved.

M.R. walked across the room to her landline telephone and dialed 911 as Davis disappeared into the darkness. While she was on the telephone with the dispatcher, Davis came up behind M.R. and grabbed her wrist that was holding the telephone "extremely hard," causing M.R. pain. Davis moved M.R.'s wrist to slam the telephone down with such force the cord came loose. M.R. screamed. Davis told M.R. to "'shut up.'"

3

Davis pulled M.R.'s hand up to her shoulder and pushed her toward the front door, then down the hallway, and into the office.[1] The lights in the office were off, and Davis did not turn the lights on. M.R. was very frightened Davis was going to kill her, rape her, or both.

Inside the office, Davis pushed M.R. over to a small sofa; he pushed the lower part of her body to the ground and her upper body onto the seat of the sofa. M.R.'s knees were on the ground, and Davis pushed M.R.'s face down into the sofa, making it difficult for her to breathe. M.R. then felt Davis pulling on the back of her jeans under her shirt. She could feel his finger on her skin; she believed his finger was inside her underpants at her waistline. M.R. felt Davis pulling her pants downward.

M.R. abruptly pulled her body up and screamed, "'No'" to Davis pulling her pants and "[n]o to everything." Davis took one of the sofa pillows and smashed it into M.R.'s face "very, very hard." M.R. felt extreme pain as if her nose had been broken. M.R. could barely breathe. M.R. wheezed, started feeling lightheaded, and thought she was going to pass out.

She then heard the landline telephone begin to ring. Davis pulled M.R. up to her feet and dragged her out of the office, back into the family room, and toward the telephone. As he dragged her to the telephone, he instructed her to tell the caller, "'[I]t was a mistake," and that M.R.'s daughter had him deliver a birthday present for M.R. as a surprise.[2]

---

[1] M.R. estimated the distance from the telephone to the sofa in the office was about 19 feet.

[2] M.R.'s only daughter testified she never asked anyone to go to M.R.'s home to surprise her with a birthday gift on August 13, 2019. She also testified she had never heard of Davis before.

Davis plugged in the receiver as it had come loose from the telephone. M.R. heard the voice of the same dispatcher with whom she had previously spoken when she dialed 911. Davis was behind M.R. but then bent to face her, inches away from her, and told her several times to tell the caller, "[I]t was a mistake." M.R. did not say anything; she was wheezing while on the telephone trying "to buy more time." The dispatcher told M.R. the sheriff deputies were very close by and she was going to be okay.

While still on the telephone with the dispatcher, M.R. saw the outdoor patio lights turn on. Two sheriff deputies appeared on the patio with guns drawn. The deputies instructed Davis to open the door. The deputies entered through the glass French doors, detained Davis, and placed him in handcuffs.

At no point did Davis try to take anything from M.R.'s house. A purse was lying on the sofa in the office but at no time did M.R. see Davis grab that purse; she did not later find anything missing from it or the house.

Davis was upset; he appeared animated, frustrated, and angry, shouting, "She knows me." He was talkative and a little erratic. He was also sweating, but he did not smell of alcohol. After he was placed in the back of a patrol car, he rambled for a long time, saying things that did not make sense.

III.

DAVIS'S TESTIMONY

Davis testified he was an alcoholic who regularly uses heroin, speed, and weed. He testified that as of August 13, 2019, he had not slept in a week. He stated that, pursuant to his usual schedule, he used heroin, speed, and weed earlier that day. He also drank alcohol throughout the day, up until his 6:00 p.m. Alcoholics Anonymous meeting, during which he blacked out.

He testified he did not remember anything from that moment until later that night when he woke up handcuffed in the back of a patrol car.

PROCEDURAL HISTORY

A jury found Davis guilty as charged in the first amended information with (1) assault with intent to commit a sexual offense during the commission of a first degree burglary (Pen. Code, § 220, subd. (b); count 1);[3] (2) kidnapping with intent to commit a sex offense (§ 209, subd. (b)(1); count 2); (3) first degree residential burglary (§§ 459 & 460, subd. (a); count 3); (4) dissuading a witness from reporting a crime (§ 136.1, subd. (b)(1); count 4); and (5) elder abuse (§ 368, subd. (b)(1); count 5).

The jury found true Davis committed counts 2 and 3 against a vulnerable victim in violation of section 667.9, subdivision (b). The jury also found true the allegation a non-accomplice was present during the commission of count 3, in violation of section 667.5, subdivision (c)(21).[4]

The trial court found the prosecution proved beyond a reasonable doubt that, pursuant to section 667, subdivision (a)(1), Davis had previously been convicted of two serious felonies (§ 1192.5), and pursuant to section 667, subdivisions (d) and (e)(2)(A) and section 1170.12, subdivisions (b) and (c)(2)(A), he had previously suffered three serious and violent felony convictions and adjudications.

The trial court also found true several alleged factors in aggravation. (Cal. Rules of Court, rule 4.421(a)(1) as to all counts ["crime involved great violence, great bodily harm, threat of great bodily harm, or

---

[3] All further statutory references are to the Penal Code unless otherwise specified.

[4] At the sentencing hearing, the trial court dismissed count 3.

6

other acts disclosing a high degree of cruelty, viciousness, or callousness"]; rule 4.421(a)(3) as to counts 1, 4, and 5 ["victim was particularly vulnerable"]; rule 4.421(b)(1) as to all counts ["defendant has engaged in violent conduct that indicates a serious danger to society"]; rule 4.421(b)(2) as to all counts ["defendant's prior convictions as an adult . . . are numerous or of increasing seriousness"]; and rule 4.421(b)(3) as to all counts ["defendant has served a prior term in prison or county jail under section 1170[, subd. ](h)"].)[5] The court further found true, as to counts 1 and 2, and pursuant to section 1203, subdivision (e)(5), Davis had suffered a prior felony conviction.

The trial court imposed an indeterminate prison term of 75 years to life plus a determinate prison term of 32 years.

Davis filed a timely notice of appeal.

## DISCUSSION

### I.

### EXCLUSION OF VIDEO AND AUDIO RECORDING AT TRIAL

Davis argues the trial court erred by denying his motion in limine seeking the admission of a video and audio recording (the recording) depicting Davis talking to himself for about 25 minutes while seated in the back of a patrol car following his arrest. In his opening brief, Davis argues the recording was relevant to show he was intoxicated at that time, and thus earlier that evening had been unable to form the specific intent to commit a sexual offense, a required element for both counts 1 and 2. He also argues the recording was admissible to show Davis's "then-existing state of mind,

---

[5] The court found the allegation under California Rule of Court, rule 4.421(a)(6) not true as to counts 1, 2, 3, and 5.

7

emotion, and physical sensation" within the meaning of Evidence Code section 1250.

"'Relevant evidence' means evidence . . . having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) "'""The test of relevance is whether the evidence tends "'logically, naturally, and by reasonable inference' to establish material facts such as identity, intent, or motive.'"'" (*People v. Hamilton* (2009) 45 Cal.4th 863, 913.) "'Evidence is relevant when no matter how weak it may be, it tends to prove the issue before the jury.'" (*People v. Freeman* (1994) 8 Cal.4th 450, 491.)

We review a trial court's ruling determining the relevance and admissibility of evidence for an abuse of discretion, disturbing it only if we conclude that the court was arbitrary or capricious in exercising its discretion which resulted in a manifest miscarriage of justice. (*People v. Parker* (2022) 13 Cal.5th 1, 53.)[6] "[W]e review the trial court's ruling, 'not the court's reasoning and, if the ruling was correct on any ground, we affirm.'" (*People v. Camacho* (2022) 14 Cal.5th 77, 123.)

---

[6] In the opening brief, citing *People v. Albarran* (2007) 149 Cal.App.4th 214, 224, footnote 7, Davis suggests we should review the trial court's evidentiary ruling de novo because his "constitutional rights are affected by the error." But the appellate court in *Albarran* expressly stated, "[T]he decision on whether evidence . . . is relevant, not unduly prejudicial and thus admissible, rests within the discretion of the trial court" and "'[w]here, as here, a discretionary power is statutorily vested in the trial court, its exercise of that discretion "must not be disturbed on appeal *except* on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice."'" (*Albarran*, at pp. 224–225.) It was an order denying a motion for new trial that the *Albarran* court reviewed de novo. (*Id.* at p. 224.)

We have reviewed the recording and cannot conclude the trial court abused its discretion in finding it irrelevant to prove whether Davis was intoxicated and had otherwise been able to form the requisite specific intent for counts 1 and 2. While the recording includes Davis's statements that he "drink[s] and do[es] drugs," Davis does not say anything about whether he was then under the influence. Instead, the recording largely shows, as observed by the trial court: "Davis on a rambling monologue that has a consistent, predominate theme of having access to ACLU phone numbers and internal affair[s] phone numbers and how he intends to, more or less, tune up the officers and make them a lot of money and that his mom has some type of information . . . that will be unleashed on social media . . . and it will be the end of the world, more or less, for these officers once she releases that" with "little tangents such as officers' treatment of him in the past, things of that nature." The recording does not show Davis was intoxicated and does not otherwise provide enough information as to his state of mind such that it would be probative of his intent.

Even if the trial court abused its discretion by deeming the recording irrelevant, the trial court ruled Davis's statements made therein to constitute inadmissible hearsay, rejecting Davis's contention they fit within the spontaneous statement exception to the hearsay rule. Although Davis acknowledges this ruling in his opening brief, he has forfeited any challenge to it because he has not provided any analysis explaining how the trial court's determination the recording was inadmissible hearsay was wrong. (*People v. Hardy* (1992) 2 Cal.4th 86, 150 [court declined to address issue which defendant only mentions and fails to expand on "with either argument or citation to relevant authority"]; *People v. Galambos* (2002) 104 Cal.App.4th

9

1147, 1159 ["defendant does not develop this argument with citations and analysis and thus has waived it"].)

In any event, any error in excluding the recording at trial was harmless. We review allegations of evidentiary error using the harmless error standard in *People v. Watson* (1956) 46 Cal.2d 818, 836. (*People v. Marks* (2003) 31 Cal.4th 197, 226–227.) The *Watson* standard requires reversal only if "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*Watson, supra,* 46 Cal.2d at p. 836.) "'[P]robability' in this context does not mean more likely than not, but merely a *reasonable chance*, more than an *abstract possibility*." (*Richardson v. Superior Court* (2008) 43 Cal.4th 1040, 1050.) The appellant bears the burden of demonstrating prejudice. (*People v. Gonzalez* (2018) 5 Cal.5th 186, 195.)

Davis acknowledges in the opening brief that "extensive evidence" of his purported intoxicated state at the time the charged offenses occurred was before the jury at trial. S.B. testified she thought Davis was drunk as he chased after her. Evidence was presented that before, during, and after the commission of the charged offenses, Davis's appearance and conduct suggested he might have been intoxicated. For example, Orange County Sheriff's Deputy Adrian Cortes described Davis's demeanor after he handcuffed him and took him out of M.R.'s house as talkative, even "rambling" about unusual things and "a little erratic." He noted Davis was sweating and appeared upset, animated, frustrated, and angry. Cortes, however, added that in his experience as a patrol deputy, detained suspects commonly exhibit such characteristics and thus they do not necessarily reflect a state of intoxication. In hindsight, however, Cortes testified he

thought Davis was possibly under the influence at the time of the charged offenses, but the thought had not crossed his mind at the time.

Davis does not explain in his appellate briefs what the recording would have added to the admitted trial evidence on the issue of intoxication. Any error in the exclusion of the recording was harmless as a matter of law.

II.

SUFFICIENCY OF THE EVIDENCE

Davis contends insufficient evidence shows he had the requisite specific intent to commit a sexual assault in the commission of counts 1 and 2. He also argues insufficient evidence supports the asportation element of count 2 (kidnapping with the intent to commit a sexual assault). For the reasons we explain, substantial evidence supports the jury's findings as to counts 1 and 2.

A. *Standard of Review*

"When the sufficiency of the evidence to support a conviction is challenged on appeal, we review the entire record in the light most favorable to the judgment to determine whether it contains evidence that is reasonable, credible, and of solid value from which a trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] Our review must presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence." (*People v. Zaragoza* (2016) 1 Cal.5th 21, 44.)

"'[A] reasonable inference . . . "may not be based on suspicion alone, or on imagination, speculation, supposition, surmise, conjecture, or guess work. [¶] . . . A finding of fact must be an inference drawn from evidence rather than . . . a mere speculation as to probabilities without evidence."'" (*People v. Davis* (2013) 57 Cal.4th 353, 360.) "'"'If the

11

circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also be reasonably reconciled with a contrary finding does not warrant a reversal of the judgment.""" (*People v. Valdez* (2004) 32 Cal.4th 73, 104.) We do not reweigh evidence, reevaluate the credibility of a witness, or settle factual conflicts, because "these are functions reserved for the trier of fact." (*People v. Xiong* (2013) 215 Cal.App.4th 1259, 1268.)

### B. Substantial Evidence Supports the Findings Davis Specifically Intended To Commit a Sexual Offense in the Commission of Counts 1 and 2

Both counts 1 (section 220, subd. (b)) and 2 (section 209, subd. (b)(1)) require the intent to commit rape, sodomy, oral copulation, or other specified sexual offenses. "The question whether the intent existed is one for the jury to determine from the conduct of the defendant and the surrounding circumstances." (*People v. Meichtry* (1951) 37 Cal.2d 385, 389.) Intent may be inferred from the facts and circumstances surrounding the crime. (*People v. Guerra* (2006) 37 Cal.4th 1067, 1130, overruled in part on other grounds in *People v. Rundle* (2008) 43 Cal.4th 76, 151.)

Here, the trial evidence of Davis's conduct and the surrounding circumstances constitutes more than substantial evidence supporting the finding Davis kidnapped and assaulted M.R. with the intent to commit a sexual offense against her. The trial evidence shows Davis, shortly after chasing and attempting to grab S.B. as she jogged down a nearby street, broke into M.R.'s house, grabbed M.R.'s arm, forcibly caused her to hang up the telephone with the dispatcher, and pushed her into the dark office of her home. Inside the office, Davis pushed M.R.'s face down into the cushions of a sofa and placed his finger inside the waistband of the back of her pants. Davis started to pull down her pants before M.R. interrupted his efforts by

12

jumping up and shouting, "[N]o"! Davis responded to M.R.'s resistance by taking a sofa pillow and smashing it into M.R.'s face with great force. M.R. testified she was afraid Davis was going to rape her. Additional evidence shows Davis did not appear interested in M.R.'s purse or any property in her residence. Substantial evidence supports the inference Davis intended to commit a sexual offense against M.R.

In his opening brief, Davis challenges the sufficiency of the evidence of his specific intent, arguing because "extensive evidence" presented at trial showed he was intoxicated the evening of August 13, 2019, he was incapable of forming the specific intent to commit a sexual offense. But the evidence of possible intoxication was not conclusive on the issue; Davis does not explain otherwise.

It was the province of the jury to consider such evidence of intoxication, along with all of the other evidence presented at trial of Davis's conduct and surrounding circumstances, to determine whether Davis had actually formed the requisite specific intent. Because substantial evidence supports the jury's finding Davis formed the requisite specific intent for the commission of counts 1 and 2, we find no error.

C. *Sufficient Evidence Supports the Asportation Element of the Kidnapping Offense*

Pursuant to section 207, subdivision (a), "simple kidnapping" requires proof of the following "'three elements: (1) a person was unlawfully moved by the use of physical force or fear; (2) the movement was without the person's consent; and (3) the movement of the person was for a substantial distance.'" (*People v. Bell* (2009) 179 Cal.App.4th 428, 435.) "This last element, i.e., that the victim be moved a substantial distance, is called the 'asportation' element." (*Ibid.*)

"Aggravated kidnapping," pursuant to section 209, subdivision (b)(1), involves a kidnapping "for the purpose of robbery or certain sex offenses." (*People v. Martinez* (1999) 20 Cal.4th 225, 232, overruled on a different ground in *People v. Fontenot* (2019) 8 Cal.5th 57, 70.) The asportation element of aggravated kidnapping has two prongs: "[A]ggravated kidnapping requires movement of the victim that is not merely incidental to the commission of the underlying crime and that increases the risk of harm to the victim over and above that necessarily present in the underlying crime itself." (*People v. Martinez, supra*, 20 Cal.4th at p. 232.) "The two prongs of aggravated kidnapping are not distinct, but interrelated, because a trier of fact cannot consider the significance of the victim's changed environment without also considering whether that change resulted in an increase in the risk of harm to the victim." (*Id*. at p. 236.)

Here, substantial evidence supports the findings Davis pushed M.R. to the office and that such movement of M.R. (1) was not merely incidental to his commission of a sexual offense against her and also (2) increased the risk of harm to M.R. above that inherent to the sexual offense itself. As to the first prong, M.R. testified she was sitting on a sofa in her family room watching television when she noticed the sensor lights on the patio turn on. After she saw Davis standing on the patio just outside the family room's set of French doors, she walked across the room to the telephone and dialed 911. While M.R. was on the telephone with the dispatcher, Davis suddenly appeared behind her, forced her to slam down the telephone receiver, and grabbed her wrist.

Although he had already overpowered her, he did not attempt to commit a sexual offense against her in the family room. Instead, he pulled M.R.'s hand up to her shoulder and pushed her from the family room toward

14

the front door of her home, then down the hallway, and into the office where he then attempted to pull down her pants. Substantial evidence shows Davis's movement of M.R., which she estimated to be a total of 19 feet, was not merely incidental to committing a sexual offense against her. (See *People v. Robertson* (2012) 208 Cal.App.4th 965, 984 ["'Where a defendant drags a victim to another place, and then attempts a rape, the jury may reasonably infer that the movement was neither part of nor necessary to the rape'"].)

Substantial evidence also shows Davis's movement of M.R. increased the risk of harm to her. By moving her out of view through the windows of the French doors, away from the front door, down the hallway and into the darkness of the office, Davis not only reduced the possibility of her escaping, he decreased the likelihood of detection should law enforcement arrive in response to M.R.'s call to 911.

As a reasonable trier of fact could conclude beyond a reasonable doubt the movement that occurred here was more than merely incidental and increased the risk of harm beyond that inherent in the commission of a sexual offense, we find no error.

### III.

#### SENTENCING ISSUES

In his opening brief, Davis raises several challenges to his prison sentence. The trial court sentenced Davis to an indeterminate term of 75 years to life by imposing three consecutive terms of 25 years to life on counts 1, 2, and 4. The court also imposed a determine term of 32 years by imposing six 5-year terms (nickel priors) under section 667, subdivision (a)(1)

plus 2 years for the enhancement under section 667.9, subdivision (b). For the reasons we explain, none of Davis's challenges has merit.

## A. *The Court Did Not Err by Finding Section 654 Inapplicable to Count 2*

Davis argues the offense of assault with intent to commit a sexual offense charged as count 1 was part of the same course of conduct as the kidnapping with the intent to commit a sexual offense count charged as count 2. Therefore, he argues, the trial court erred by failing to stay count 2 pursuant to section 654.

Under section 654, "[a]n act or omission that is punishable in different ways by different provisions of law may be punished under either of such provisions, but in no case shall the act or omission be punished under more than one provision." (§ 654, subd. (a).) "[T]he purpose of section 654 is to ensure that a defendant's punishment will be commensurate with his culpability." (*People v. Correa* (2012) 54 Cal.4th 331, 341.) Section 654 precludes multiple punishments not only for a single act, but also for an indivisible course of conduct. (*Ibid.*) If two or more offenses "were merely incidental to, or were the means of accomplishing or facilitating one objective, [a] defendant may be found to have harbored a single intent and therefore may be punished only once." (*People v. Harrison* (1989) 48 Cal.3d 321, 335.)

A defendant's intent and objective are factual questions for the trial court and as such, must be upheld on appeal if supported by substantial evidence. (*People v. Coleman* (1989) 48 Cal.3d 112, 162.) Here, neither the parties nor the trial court addressed the applicability of section 654 on count 2. We therefore consider whether substantial evidence supports the trial court's implicit finding Davis's intent and objective in assaulting M.R. were separate from, rather than incidental to, his intent and objective in

16

kidnapping her, rendering the imposition of multiple punishments permissible. (*People v. Coleman, supra*, 48 Cal.3d at p. 162.)

We conclude sufficient evidence supports the court's implicit finding section 654 did not apply to count 2. Had Davis's assault of M.R. been limited to grabbing her wrist and pushing her from the family room to the office, the imposition of separate punishment for the offense of kidnapping with the intent to commit a sexual assault would have been impermissible under section 654. But here, M.R. testified after Davis pushed her into the office and onto the sofa and reached his finger into the waistband of her pants to begin pulling her pants down, M.R. interrupted Davis's assault by jumping up and shouting, "[N]o" at him. Davis responded by assaulting Davis anew—this time by smashing a sofa pillow into M.R.'s face with great force.

Substantial evidence thus shows M.R.'s interruption of Davis's assault, albeit brief, provided an opportunity for Davis to reflect upon and abandon his assaultive behavior that accompanied the asportation of M.R. to the office. Davis elected to resume his assault of Davis by striking her in the face with the sofa pillow. The trial court therefore did not err by implicitly finding section 654 inapplicable and punishing Davis for both assault with the intent to commit a sexual offense and kidnapping with the intent to commit a sexual offense.

B. *The Trial Court Did Not Abuse Its Discretion by Refusing To Strike Any of the Nickel Priors*

Davis argues the trial court erred by denying his request to strike any of Davis's six nickel priors pursuant to section 667, subdivision (a)(1), found true by the trial court. Consequently, the trial court imposed two 5-year prison terms on each of counts 1, 2, and 4. The nickel prior

enhancements thus comprised 30 years of the total 32-year determinate prison term imposed by the trial court.

"[A] court's decision to strike a qualifying prior conviction is discretionary. [Citation.] As such, a court's decision not to strike a prior necessarily requires some exercise of discretion." (*People v. Carmony* (2004) 33 Cal.4th 367, 375, italics omitted.) When a defendant challenges the court's refusal to strike an enhancement, "[t]he burden is on the [defendant] to clearly show that the sentencing decision was irrational or arbitrary. [Citation.] In the absence of such a showing, the trial court is presumed to have acted to achieve legitimate sentencing objectives, and its discretionary determination to impose a particular sentence will not be set aside on review.'" (*People v. Superior Court* (*Alvarez*) (1997) 14 Cal.4th 968, 977–978.)

At the sentencing hearing, the trial court stated that, in declining to strike any of the nickel priors, the court considered "all the discretionary power and authority that [had] been vested" in the court and further stated it had specifically evaluated the nature of the offenses, Davis's background, the circumstances surrounding Davis's present and prior offenses, the mitigating circumstances, rule 4.410 of the California Rules of Court, Davis's constitutional rights, and "the interests of society to ensure that [Davis's] punishment fits the crime . . . as well as the perpetrator, . . . Section 1385, and any other required or discretionary criteria required by the court to consider." The court stated that after weighing and considering "any and all required and discretionary criteria," it found the "dismissal of an enhancement would endanger public safety," as "there is a likelihood that the dismissal of the enhancement and/or strike would result in physical injury or other serious danger to others."

In his opening brief, Davis does not argue the trial court considered any inappropriate factor or otherwise demonstrated a misapprehension of the law applicable to the determination of whether to strike any nickel prior. Instead, he argues the trial court abused its discretion in refusing to strike the nickel priors because "[a]bsent from the court's analysis is any mention of [Davis]'s substance abuse issues, childhood trauma, mental health issues, the fact that the prior offenses were well over five years old, or any of the other issues trial counsel discussed in the defense sentencing brief." Davis, however, did not raise this challenge to the trial court's explanation of its sentencing decision when the court announced it at the sentencing hearing.

In *People v. Scott* (1994) 9 Cal.4th 331, 353, the Supreme Court held: "[T]he waiver doctrine should apply to claims involving the trial court's failure to properly make or articulate its discretionary sentencing choices. Included in this category are cases in which . . . the court purportedly erred because it . . . misweighed the various factors, or failed to state any reasons or give a sufficient number of valid reasons."[7] The California Supreme Court explained: "Our reasoning is practical and straightforward. Although the court is required to impose sentence in a lawful manner, counsel is charged with understanding, advocating, and clarifying permissible sentencing choices at the hearing. Routine defects in the court's statement of reasons are

---

[7] The Supreme Court in *People v. Scott, supra*, 9 Cal.4th at page 354, made clear that an unauthorized sentence, defined as one which could not be lawfully imposed under any circumstance in the particular case, may be corrected by an appellate court at any time. The Supreme Court explained: "Appellate courts are willing to intervene in the first instance because such error is 'clear and correctable' independent of any factual issues presented by the record at sentencing." (*Ibid.*) Davis does not contend the trial court imposed such an unauthorized sentence here.

easily prevented and corrected if called to the court's attention. As in other waiver cases, we hope to reduce the number of errors committed in the first instance and preserve the judicial resources otherwise used to correct them." (*Id*. at p. 353.) Because he failed to challenge the court's statement of reasons in the trial court, Davis has forfeited bringing any such challenge on appeal.

In any event, the record reflects the trial court articulated rational reasons for its decision to deny Davis's request to strike the nickel priors. Although the court did not specifically mention factors cited in Davis's sentencing brief, Davis does not cite any legal authority, and we have found none, showing the court was required to specifically address all relevant factors in stating the reasons for its sentencing decision. Furthermore, as quoted *ante*, the trial court stated it considered all relevant factors in rendering its decision; nothing in the record suggests otherwise. We find no abuse of discretion.

## C. The Trial Court Did Not Abuse Its Discretion by Denying Davis's Motion To Dismiss His Prior Strikes

"When a defendant is convicted of a felony, and it is pleaded and proved he had committed prior 'violent' or 'serious' felonies, the Three Strikes law provides for the imposition of increased sentences. [Citations.] A trial court is presumed to have acted properly whenever it sentences a defendant in accordance with the Three Strikes law. [Citation.] A sentencing court nonetheless has the power to dismiss one or more prior strike convictions in the interests of justice." (*People v. Nunez* (2023) 97 Cal.App.5th 362, 370.) "In deciding whether to exercise its discretion to dismiss a prior strike conviction in the interests of justice, a trial court 'must consider whether, in light of the nature and circumstances of his present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character,

and prospects, the defendant may be deemed outside the [sentencing] scheme's spirit, in whole or in part, and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies.'" (*Id*. at pp. 370–371; see also *People v. Williams* (1998) 17 Cal.4th 148, 161.)

A trial court's decision not to strike a prior felony conviction is reviewed for abuse of discretion, and "'"[t]he burden is on the party attacking the sentence to clearly show that the sentencing decision was irrational or arbitrary."'" (*People v. Carmony, supra*, 33 Cal.4th at p. 376.) "[A] trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it." (*Id*. at p. 377.) In light of the "presumption that any sentence conforming to the Three Strikes law's sentencing norm is both rational and proper[,]" "'a trial court will only abuse its discretion in failing to strike a prior felony conviction allegation in limited circumstances,' such as 'where the trial court was not "aware of its discretion" to dismiss [a prior strike] (citation), or where the court considered impermissible factors in declining to dismiss [a prior strike],' or 'where no reasonable [person] could disagree [the defendant] falls outside the spirit of the three strikes [law] scheme.'" (*People v. Nunez, supra*, 97 Cal.App.5th at p. 371.)

Here, Davis argues the trial court abused its discretion by denying his *Romero* motion[8] and declining to dismiss any of his three prior strikes which consisted of a 1988 robbery conviction and convictions for attempted robbery and assault with a deadly weapon in 1996. In refusing to strike any of Davis's prior strikes on the ground doing so would endanger

---

[8] *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497 (*Romero*).

21

public safety, Davis argues the trial court "failed to properly consider the length of [Davis]'s sentence, his substance abuse issues, the staleness of the prior strikes, and his youth at the time of the first strike."

Applying the governing deferential standard of review, however, we conclude the record reflects the trial court properly exercised its discretion. With respect to its denial of the *Romero* motion, at the sentencing hearing, the court reiterated that the court read and considered Davis's aggravating and mitigating factors as indicated in the probation and sentencing report and by counsel in sentencing briefing. The court reiterated that the court read and considered rule 4.425 of the California Rules of Court.

The court stated it agreed with the statement in the probation and sentencing report that Davis's "'actions in this case are deplorable as they appear to have been committed for no other reason than power and self-gratification. The victim was elderly, lived alone, and was unable to defend herself. It is difficult to imagine how frightened she likely felt as she was assaulted by a stranger in the sanctity of her home where … she should have felt safe and protected from harm.'" The court further stated: "'It is difficult to see [Davis] as anything other than a violent opportunist—opportunistic predator who selfishly pursued his own desires. It seems clear [Davis] presents a threat to the safety of others." The court also cited M.R.'s statement: "'I would hate to think of another woman going through the terrifying experience that I did.'"

The trial court further observed: "[A]t the time of the offense the victim was an 88-year-old woman who had lived on her own in the safety of her home for 23 years after her husband's passing. When the victim testified, she was bright, sharp, and healthy. Since the offense, it appears she has transformed from an outgoing person who had a rich and active life to

someone who was afraid to—of coming home at night and therefore had to stop attending evening events to deal with her sense of uneasiness. She subsequently felt the need to give up her independence and move into an assisted-living facility."

In his opening brief, and similar to his challenge to the court's refusal to dismiss the nickel priors, Davis argues that in denying the *Romero* motion, the trial court failed to address (1) Davis's substance abuse issues; (2) the "staleness of [his] prior strikes"; and (3) Davis's youth at the time he was convicted of his first strike. He further argues that given his circumstances, including his drug addiction, mental health issues, and childhood trauma, "the equivalent of a life sentence…is unfair and unjust" and "contradicts the purpose of sentencing reform—to decrease the severity and length of sentences."

But "'[t]he trial court is not required to state reasons for declining to exercise its discretion under section 1385' [citation], and 'is presumed to have considered all of the relevant factors in the absence of an affirmative record to the contrary.'" (*People v. Brugman* (2021) 62 Cal.App.5th 608, 637.) There is no indication in our record the trial court believed it could not consider relevant factors, considered improper factors, or failed to give proper consideration to all relevant factors. Indeed, the court stated on the record it considered all relevant factors before denying the *Romero* motion. That the trial court commented on the seriousness of Davis's offenses, the consequences M.R. had suffered, and the danger Davis poses to society does not mean those are the only factors the court considered. (See *People v. Myers* (1999) 69 Cal.App.4th 305, 310 ["that the court focused its explanatory comments on the violence and potential violence of appellant's crimes do[es] not mean that it considered only that factor"].)

23

*People v. Avila* (2020) 57 Cal.App.5th 1134, which Davis cites in his opening brief, does not compel a different result. There, the defendant demanded money from two different individuals selling oranges and in one instance squashed two bags of oranges and in another instance threw a bag of oranges to the ground and stomped on them. (*Id.* at p. 1139.) The defendant was convicted of attempted second degree robbery and attempted extortion, and he was sentenced to 25 years to life plus 14 years after the trial court denied his *Romero* motion, which sought to strike his three prior strikes. (*Id.* at pp. 1139–1140.) The appellate court concluded the trial court had abused its discretion in denying the *Romero* motion. (*Id.* at pp. 1140–1145.) While *Avila* recognized the defendant's age and the length of time since the prior offenses could be factors in mitigation, *Avila* did not hold that those circumstances always require finding an abuse of discretion. (See *id.* at pp. 1141–1142 [noting "remoteness remains a factor in mitigation" and it was "significant that [defendant] committed his prior strikes when he was under the age of 21"].) Notably, *Avila* recognized the defendant's present offense in that case "was not violent or brutal by any stretch" and he "did not use a weapon or otherwise use physical violence against the victims, nor did he make any specific threats." (*Id.* at p. 1142.)

The circumstances here are plainly different, where Davis's offenses of assault with the intent to commit a sexual offense and kidnapping with the intent to commit a sexual assault involved, inter alia, physical violence against M.R.

We find no error in the court's denial of the *Romero* motion and refusal to strike Davis's prior strikes.

24

*D. Cruel and/or Unusual Punishment*

Davis contends his indeterminate prison sentence of 75 years to life plus a determinate term of 32 years constitutes cruel and/or unusual punishment under article I, section 17 of the California Constitution and the Eighth Amendment to the United States Constitution. The California Constitution prohibits "cruel or unusual" punishment, and the United States Constitution prohibits "cruel and unusual" punishment. "'The distinction in wording is "purposeful and substantive rather than merely semantic."'" (*People v. Baker* (2018) 20 Cal.App.5th 711, 723 (*Baker*).) Therefore, "'we construe the state constitutional provision "separately from its counterpart in the federal Constitution."'" (*Ibid.*) "'Whether a punishment is cruel or unusual is a question of law for the appellate court, but the underlying disputed facts must be viewed in the light most favorable to the judgment.'" (*People v. Gomez* (2018) 30 Cal.App.5th 493, 499.)

1. California Constitution

The California Constitution prohibits "[c]ruel or unusual punishment." (Cal. Const., art. I, § 17.) "[A] sentence will not be found unconstitutional under the California Constitution unless it is so disproportionate to the defendant's crime and circumstances that it shocks the conscience or offends traditional notions of human dignity." (*People v. Perez* (2016) 3 Cal.App.5th 612, 616.) The California Supreme Court has described three "techniques" to aid in determining whether a sentence is so disproportionate that it is unconstitutional: (1) "examin[ing] the nature of the offense and/or the offender, with particular regard to the degree of danger both present to society"; (2) "compar[ing] the challenged penalty with the punishments prescribed in the same jurisdiction for different offenses which, by the same test, must be deemed more serious"; and (3) "compar[ing] . . . the

challenged penalty with the punishments prescribed for the same offense in other jurisdictions having an identical or similar constitutional provision." (*In re Lynch* (1972) 8 Cal.3d 410, 425–427, italics omitted.)

"'The weight afforded to each prong may vary by case. [Citation.] "Disproportionality need not be established in all three areas."'" (*People v. Wilson* (2020) 56 Cal.App.5th 128, 167–168.) "'A defendant has a considerable burden to overcome when he challenges a penalty as cruel or unusual. The doctrine of separation of powers is firmly entrenched in the law of California and the court should not lightly encroach on matters which are uniquely in the domain of the Legislature.'" (*People v. Johnson* (2010) 183 Cal.App.4th 253, 296.)

At the sentencing hearing, the trial court stated it "applied a three-prong test to determine whether [the sentence it imposed] is unconstitutionally disproportionate to the offenses for which it is imposed and assigned importance of each of the prongs depending upon the facts of this specific case." After doing so, the court stated it found Davis's sentence was not "'so disproportionate to the crimes committed that it shocks the conscience and offends fundamental notions of human dignity'" to violate the prohibition against cruel and/or unusual punishment under the state and federal constitutions.

Davis fails to overcome the considerable burden of establishing his sentence was cruel or unusual. The jury found him guilty of, inter alia, assault with intent to commit a sexual offense and kidnapping with intent to commit a sexual offense. We cannot "conclude this case is among the rarest of the rare in which the punishment imposed violates article I, section 17 of the California Constitution." (*In re Nuñez* (2009) 173 Cal.App.4th 709, 725.)

On appeal, Davis argues the degree to which he poses a "danger to society cannot be analyzed without considering [how his] mental health and substance abuse issues were a major factor in his commission of the offenses." He argues "[i]n that light, mental health treatment and drug and alcohol rehabilitation would go a long way in reducing his danger to society."

Davis also argues "the large bulk of [his] sentence (his third strike status and section 667, subdivision (a) enhancements) is for conduct that occurred over a quarter of a century ago." Such factors, however, are insufficient to outweigh the seriousness of the assault and kidnapping with the intent to commit a sexual offense at issue here. (See, e.g., *Baker, supra*, 20 Cal.App.5th at pp. 724–725 [weighing factors].)

Davis also contends the sentence was disproportionate to his offenses, citing the United States Department of Justice, Office of Justice Programs, Bureau of Justice Statistics stating the median *time served* in state prison for murder is 17 and one-half years. Davis does not provide further analysis and does not compare his sentence with the sentences prescribed in California for more serious offenses. Nor does he provide a comparative analysis of the sentence he received with the sentences prescribed for the same offenses in other jurisdictions which have an identical or similar cruel or unusual constitutional provision.

Davis also argues the trial court here imposed "the functional equivalent" of a sentence of life without the possibility of parole. But "it is immaterial that [a] defendant cannot serve his sentence during his lifetime. In practical effect, he is in no different position than a defendant who has received a sentence of life without possibility of parole: he will be in prison all his life. However, imposition of a sentence of life without possibility of parole in an appropriate case does not constitute cruel or unusual punishment

under either our state Constitution [citation] or the federal Constitution." (*People v. Byrd* (2001) 89 Cal.App.4th 1373, 1383.)

In support of his arguments, Davis relies on a concurring opinion of Justice Mosk in *People v. Deloza* (1998) 18 Cal.4th 585, 600–602. But concurring opinions are not binding authority. (*Byrd, supra*, 89 Cal.App.4th at p. 1383.) Davis does not cite any binding authority concluding a sentence surpassing an adult defendant's possible lifespan constitutes cruel or unusual punishment.

Davis has failed to show his sentence is so disproportionate to his crimes and circumstances that "it shocks the conscience or offends traditional notions of human dignity" to violate the cruel or unusual provision of the California Constitution. (*People v. Perez, supra*, 3 Cal.App.5th at p. 616.)

2. United States Constitution

The Eighth Amendment to the United States Constitution prohibits "cruel and unusual punishments." It "contains a 'narrow proportionality principle,' that 'does not require strict proportionality between crime and sentence' but rather 'forbids only extreme sentences that are "grossly disproportionate" to the crime.'" (*Graham v. Florida* (2010) 560 U.S. 48, 59–60.) "This proportionality principle is narrow when applied in noncapital cases." (*People v. Wilson, supra*, 56 Cal.App.5th at p. 167.) Indeed, successful challenges are "'exceedingly rare'" in noncapital cases. (*Ewing v. California* (2003) 538 U.S. 11, 21.)

Considerable overlap exists in the state and federal approaches to cruel and/or unusual punishment. Although slightly different in text, "'both standards prohibit punishment that is "grossly disproportionate" to the crime or the individual culpability of the defendant.' [Citation.] 'The touchstone in each is gross disproportionality.'" (*Baker, supra*, 20 Cal.App.5th at p. 733.)

28

An Eighth Amendment analysis begins with a comparison of "'the gravity of the offense and the severity of the sentence.' [Citation.] 'This analysis can consider a particular offender's mental state and motive in committing the crime, the actual harm caused to his victim or to society by his conduct, and any prior criminal history.'" (*Baker, supra*, 20 Cal.App.5th at p. 733.)

For the same reasons stated in our state constitutional analysis, we conclude Davis cannot show the sentence violates the Eighth Amendment to the federal Constitution either.

DISPOSITION

The judgment is affirmed.

MOTOIKE, ACTING P. J.

WE CONCUR:

SANCHEZ, J.

DELANEY, J.